ERIE LACKAWANNA RAILWAY COM-
PANY, Plaintiff,

v.

LIGHTER CAPTAINS UNION, LOCAL
996, I. L. A., et al., Defendants.

LEHIGH VALLEY RAILROAD COM-
PANY, Plaintiff,

v.

LIGHTER CAPTAINS UNION, LOCAL
996, et al., Defendants.

The BALTIMORE AND OHIO RAIL-
ROAD COMPANY, a corpora-
tion, Plaintiff,

v.

LIGHTER CAPTAINS UNION, LOCAL
996, et al., Defendants.

R. D. TIMPANY, solely as Trustee of the
property of the Central Railroad Com-
pany of New Jersey, Plaintiff,

v.

LIGHTER CAPTAINS UNION, LOCAL
996, et al., Defendants.

Civ. A. Nos. 1945–71 to 1947–71,
and 5–72.

United States District Court,
D. New Jersey.

Jan. 27, 1972.

Vincent E. McGowan, Hoboken, N. J. (Frederick G. Hoffmann, Hoboken, N. J., of counsel), for Erie Lackawanna Railway Co.

Nolan & Lynes by Daniel J. Moore, Newark, N. J., for Lehigh Valley Railroad Co.

Lamb, Blake, Hutchinson & Dunne by Raymond J. Lamb, Jersey City, N. J. (Albert W. Laisy, Baltimore Md., of counsel), for Baltimore & Ohio Railroad Co.

Roger L. Camacho, Clifton, N. J., for R. D. Timpany, Trustee, Central R. R. Co.

Thomas L. Parsonnet, Parsonnet & Parsonnet, Newark, N. J., and Waldman & Waldman, New York City (Seymour M. Waldman, New York City, of counsel), for defendants.

LACEY, District Judge:

Plaintiffs sue in these consolidated matters to enjoin a threatened strike by the defendant Union. Their Complaints charge that in collective bargaining negotiations with their multi-employer bargaining unit representative, the New York Harbor Carriers' Conference (the Committee), the Union has violated the imperative of § 2 First of the Railway Labor Act (the Act) (45 U.S.C. § 152 First) "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions".[1] Jurisdiction over the subject matter of this action is conferred upon this Court by 28 U.S.C. § 1337.[2] Temporary restraining orders enjoining the strike have issued, and by consent of the parties are still outstanding. The instant matter comes on by way of plaintiffs' application for a preliminary injunction.

Plaintiffs are corporations engaged in the interstate rail transportation of freight and passengers and are carriers within the meaning of the Act (45 U.S.C. § 151 First). The defendant Union is the collective bargaining representative

---

1. The subsection provides:
 It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

2. § 1337 reads: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."
 The Railway Labor Act is such an Act. Felter v. Southern Pac. Co., 359 U.S. 326, 329, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959).

through which the other named defendants function in their representation under the Act (45 U.S.C. §§ 151 Fifth–152) of certain present and former employees of the plaintiffs.

The parties have been and still are involved in a major labor dispute under the Act.[3] The procedures for resolving such a dispute have been outlined as follows by the United States Supreme Court

3. Actually whether a dispute is major or minor has no significance here at this juncture. *See* Atlanta & West Point R. Co. v. United Transportation Union, 439 F.2d 73, 78 n. 9 (5 Cir. 1971), cert. denied, 404 U.S. 825, 92 S.Ct. 53, 30 L. Ed.2d 53 (1971):

The "major"—"minor" distinction evolved from Elgin, Joliet & Eastern Ry. Co. v. Burley, 1945, 325, U.S. 711, 722–723, 65 S.Ct. 1282, 89 L.Ed. 1886. It is *not articulated in the Railway Labor Act.* Judge (now Mr. Justice) Marshall has stated:

The words "major" and "minor" have, no intrinsic legal significance. They are derived from the terminology of railway industrial relations and are used judicially merely as a shorthand way of referring to a distinction *incorporated in the structure of the Railway Labor Act.* The statute, itself, however, does not use the words. The distinction is of legal significance solely because the Act establishes mutually exclusive mandatory procedures to be followed in resolving two different kinds of disputes.
Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 2 Cir. 1962, 307 F.2d 21, 42–43 (dissenting opinion), cert. denied, 1963, 372 U.S. 954, 83 S. Ct. 949, 9 L.Ed.2d 978.

The courts have provided sundry interpretations of the distinction between the two types of dispute. *See, e. g.,* Railway Express Agency, Inc. v. Brotherhood of Railway, Airline & Steamship Clerks, 5 Cir. 1971, 437 F.2d 388. United Industrial Workers, etc. v. Board of Trustees of Galveston Wharves, 5 Cir. 1965, 351 F.2d 183, 188–189; St. Louis, San Francisco & Texas Ry. Co. v. R. R. Yardmasters, 5 Cir. 1964, 328 F.2d 749, 752–753, cert. denied, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748; Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, *supra,* 307 F.2d at 33–34.
*Cf.* Ruby v. TACA International Airlines, S.A., 439 F.2d 1359, 1361 (5 Cir. 1971), n. 2:

For a capsule summary of the history and legal import of the "major"—"minor" distinction under the Railway Labor Act, see Seaboard World Airlines, Inc. v. Transport Workers Union, 2 Cir., 1970, 425 F.2d 1086, 1089–1090.

A more exhaustive treatment will be found in Harper, Major Disputes Under the Railway Labor Act, 35 J. Airlines & Com. 3 (1969).
Finally, *see* Railway Exp. Agency, Inc. v. Brotherhood of Railway, Airline & Steamship Clerks, 437 F.2d 388, 391–392 (5 Cir. 1971) cert. denied, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971):

. . . In Brotherhood of Locomotive Firemen and Enginemen v. Florida East Coast Ry. Co., 5 Cir., 1965, 346 F.2d 673, we said:
"Under the Railway Labor Act, minor disputes involve grievances or questions of interpretation of an existing collective bargaining contract; major disputes arise from efforts to change working conditions through the making of a new agreement." 346 F.2d at 676.
In making that statement, we, as was the case with the district court, here, relied on Elgin, Joliet & Eastern Ry. Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886, where the Supreme Court set out the rationale of the Act as it relates to the handling of disputes between management and labor. Major disputes must be resolved under the procedures set forth in § 6 of the Act, 45 U.S.C.A. § 156. There must· be notices of intended changes, negotiations, possible mediation by the National Mediation Board. All of these procedures must be exhausted before the employer may implement the intended changes and before the union is free to strike. Minor disputes, on the other hand, are for arbitration before the National Railroad Adjustment Board or before a Special Adjustment Board established by the parties.[2] The Act provides for compulsory arbitration of all minor disputes and prohibits all strikes over minor disputes. Brotherhood of Railway Trainmen v. Chicago River & Ind. Ry. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.
(N. 2 provides: "Section 2, Sixth of the Act, 45 U.S.C.A. § 152, is directed to minor disputes in the following language:
'Sixth. In case of a dispute * * * arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * *'")
*And see* Int'l. Bro. of Teamsters, etc. v. Braniff Int. Airways, Inc., 437 F.2d 1272,

in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

. . . A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor · to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation· service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

*See also* Detroit & Toledo Shore Line R. R. v. United Transp. Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); United Transp. Union etc. v. St. Paul Union Depot Co., 434 F.2d 220, 221–222 (8 Cir. 1970), *cert. denied,* 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971).

Negotiations between the parties began in May, 1970, after they had exchanged § 6 Notices, served pursuant to 45 U.S.C. § 156.[4] Plaintiffs, as permitted by the Act (45 U.S.C. § 151 Sixth), bar-gained through the Committee, for many years the multi-employer bargaining representative for carriers serving the New York Harbor area, with which the defendant Union had bargained and negotiated labor agreements for over 10 years. The § 6 demands of the Union called for increased wages and fringe benefits, and demanded job and wage protection, as follows:

VI. GUARANTEED ANNUAL WAGE: An employee who completes one (1) year of employment, shall be guaranteed 52 weeks pay, at 100% of his wages; until he leaves the company service by reason of retirement, resignation or dies.

The plaintiffs' counterproposals related principally to rules changes.

The affidavits and evidence at hearings on January 17 and 18, 1972, disclose the following. Negotiations at several meetings following May, 1970, led to Union rejection of a Committee "last offer" on or about September 2, 1970 (Ex. P-20); and on September 3, 1970, the Committee, invoking § 5 First of the Act (45 U.S.C. § 155 First), applied for mediation by the National Mediation Board (the Board) (Ex. P-5), the Union acquiesced (Ex. P-7), and a mediator was appointed (Exs. P-6 and 8).

The first ·meeting with the mediator was on November 16, 1970. Subsequent meetings led to a Union modification in December, 1970, of its § 6 demands; a further Union modification on March 11, 1971 (Ex. P-10); a Committee proposal on March 18, 1971 (Ex. P-21); and a Union counterproposal on April 1, 1971 (Ex. P-11). With the parties still unable to agree, the Board on April 19, 1971, stated that it was unable to effect a settlement of the dispute through mediation and, pursuant to § 5 First, urged that the parties submit to binding ar-

---

1273–1274 (5 Cir. 1971) ; Northwest Airlines, Inc. v. Air Line Pilots Ass'n Int'l, 325 F.Supp. 994, 997 (D.Minn.1970).

4. § 6 of the Act provides in part as follows: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions . . . ." The Union's § 6 Notice (Ex. D–1) was served on September 2, 1969; the Carrier Proposals (Ex. P–4) were served on or about September 22, 1969.

bitration (Ex. P-13). The Committee agreed; the Union declined (Exs. P-14 and 15). On April 23, 1971, therefore, the Board formally relinquished jurisdiction (Ex. P-16), although in subsequent months it continued its mediatory role nonetheless.

On May 11, 1971, the Union submitted another modification of its job protection demands, and then on May 18 and 19, 1971, the parties met in Washington with the Board and arrived at partial agreement on certain wage increases, the agreement further providing for continuing negotiations until December 1, 1971, during which time the Union agreed not to strike and the plaintiffs agreed they would "not change the working agreements." The agreement also stated that a standing committee would be established "to handle the question of the flexibility of use of Captains and employee protection in connection therewith." The agreement was executed by all the carriers then represented by the Committee, that is, all of the plaintiffs herein, and the Penn Central Transportation Company (Penn Central) (Ex. P-17).

The evidence does not disclose any substantial bargaining progress thereafter. Then, on November 29, 1971, on the eve of expiration of the strike extension provided by the May 28, 1971, agreement, Penn Central withdrew from the multi-employer bargaining unit and revoked its power of attorney from the Committee while at a joint meeting of the parties with a mediator (Robert Cerjan), announcing its intention to bargain thereafter separately with the Union. There is no evidence that the Union by any action, or threat of any action, directed solely or selectively at Penn Central, induced, persuaded or coerced it to withdraw. Indeed, plaintiffs neither then nor now make such a charge, but argue only that Penn Central's move was involuntary in the face of the threatened strike against all the railroads (Baltimore & Ohio Reply Memorandum, pp. 1–2). However, during the separate bargaining after November 29, plaintiffs did not style the withdrawal illegal or violative of any agreement among the carriers, or otherwise complain about it to either the Union or mediator. Only the Union's representative raised the question of legality—with the mediator. He received no response; however, it is evident that the Board, by reason of the major role played by it in negotiations thereafter, saw nothing untoward in the circumstances.

With the May 28, 1971, extension agreement about to expire, on November 30, 1971 the Union entered into two separate extension agreements, one with Penn Central, the other with the plaintiffs, waiving its right to strike for an additional 15 days. The plaintiffs did not object to the Union dealing separately with Penn Central.

Thereafter, still without protest from the plaintiffs, negotiations continued in Washington, conducted separately as to the Union and Penn Central on the one hand, and the Union and the four plaintiffs herein on the other. Bargaining occurred on December 2, 3, 7, 8, 13 and 14, 1971, under the Board's direction. The four plaintiffs continued to bargain through the Committee, whose chairman, when Penn Central withdrew, had become Erie Lackawanna's Raymond A. Carroll, replacing as chairman a Penn Central employee, Robert Brown. Brown had been chairman since July, 1971, when he replaced J. W. Oram, chairman of the Committee from the beginning of negotiations. One plaintiff (Baltimore & Ohio) now argues there was an element of unfairness in all this, in that

. . . the B & O and other plaintiffs relied upon and put their trust in the chairman of the bargaining unit. There were forty-nine separate sessions, lasting from one day up to nearly a week's time duration, throughout the bargaining. At many of these sessions, B & O's sole representative was the chairman of the unit, and B & O and other plaintiffs did not have an officer at such sessions. (Baltimore & Ohio Reply Memorandum, pp. 7–8).

This contention is significant for what it does not say. Did not plaintiffs receive reports from the various chairmen? If not, on what information did they act when they signed the May 28, 1971, agreement, and submitted their interim proposals? Were not the various Union proposals communicated to the plaintiffs severally? It is not claimed otherwise. Nor is it specifically claimed by B & O that it never had a representative present at negotiations when Mr. Brown of Penn Central was chairman; indeed, we do not know how many sessions, if any, were held during his tenure. If information was lacking when Penn Central withdrew, and Mr. Carroll became chairman, he would have been the one immediately aware of it; yet his testimony neither makes nor supports such a claim. The November 29, 1971, extension agreement was signed by the plaintiff carriers without a complaint that their bargaining positions were embarrassed by Mr. Brown's termination. Poverty of knowledge, if it existed, could have been readily redressed by a de-briefing of Mr. Brown. For these reasons, plaintiffs' argument (expressed only by B & O) must be dismissed as totally without merit.

On either December 7 or 8, the Union once again modified its proposals or demands on job protection, this time tendering a proposition under which captains who lost employment would receive on a varying scale initially $50.00 a week and later $100.00 a week over a period of 15 years. When first offered, this proposition was tendered in essentially the same terms, although independently, to both Penn Central on the one hand and the plaintiffs on the other.

By December 14, 1971, however, the essentials of the negotiations between the Union and Penn Central had undergone a change. Plaintiffs learned this on December 14, 1971, when Mr. Carroll was advised that the Union and Penn Central had reached an agreement, subject to membership ratification (by Penn Central employees voting separately), without job protection; and Mr. Carroll immediately advised the Union that the plaintiffs would enter into a like agreement. On December 15, 1971, in the ratification vote, the Penn Central employees unanimously accepted the Union-Penn Central agreement. The balance of the membership, including the members employed by the plaintiffs in this case, voting together, unanimously rejected Mr. Carroll's proposal. Plaintiffs complain about this separate voting. Obviously, the Penn Central employees should have voted, and were entitled to vote, separately. Plaintiffs then make the further claim that the employees of each should also have been permitted to vote as a separate group. The answer to this argument is, first, the employees did not ask to do so; second, there was one proposal, that submitted by Mr. Carroll, for *all* of the plaintiffs; and third, in any event, the employees *unanimously* rejected plaintiffs' proposal.

Thereafter, on December 21, 1971, the Union gave to Mr. Carroll and the plaintiffs herein a strike notice, effective January 4, 1972. The strike was enjoined by the temporary restraining orders entered herein and on January 4 the parties met in another bargaining conference. At this conference the Union, at the suggestion of Mr. Cerjan, the Board mediator, offered to 3 of the 4 plaintiffs (Baltimore & Ohio, Lehigh Valley, and Central Railroad of N. J.) this proposal —settlement of the job protection demand by a severance payment of $5,000 for each captain. These three carriers have gone, or shortly will go, out of the lighterage business, which is why they were offered treatment different from that tendered Erie Lackawanna. At this same conference the so-called "15 year" demand, theretofore presented by the Union on December 7 or 8, was re-presented to Erie Lackawanna. No agreement was reached and this conference apparently terminated unhappily when the Union representative took offense at what he felt was a basically unfair carrier demand which sought to modify the $5,000

proposal. The record discloses no meetings thereafter between the parties.

On the basis of the foregoing, the plaintiffs charge that the defendant Union has abridged the Act's mandate to bargain in good faith, and, therefore, under the rule of Chicago & N. W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), that the Union has disabled itself from utilizing the self-help economic weapon of the strike.[5] Plaintiffs thus seek preliminary injunctive relief against the defendants which would enjoin a strike and direct "good faith" bargaining.

Analysis of *Chicago & N. W. Ry.* reveals that the Supreme Court held: § 2 First of the Act requires good faith bargaining; that a strike following a Union's failure to bargain in good faith can be enjoined, the Norris-LaGuardia Act's anti-injunctive provisions notwithstanding (402 U.S. at 572, n. 2; 579, n.

12, 91 S.Ct. 1731); and that thereafter the Union could by injunction be directed to return to the bargaining table, this time to pursue good faith bargaining procedures. 402 U.S. at 581, 91 S.Ct. 1731. *Cf.* 402 U.S. at 596, 91 S.Ct. 1731 (Brennan J., dissenting). The Supreme Court remanded and, on remand, the United States District Court held that the Union had not bargained in good faith and it enjoined the threatened strike and ordered resumption of bargaining, this time in good faith. 330 F.Supp. 646 (N.D.Ill.1971).

Our task is thus clearly defined. The good faith of the Union in labor negotiations having been challenged, we must, after holding such hearings as are appropriate, evaluate the evidence thus adduced, and make a determination on the "good faith" issue. It is a task which must be approached with "great circumspection."[6, 7] The late Justice Harlan,

---

5. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

> Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help —"the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration." Florida E.C.R. Co. v. [Brotherhood of] Railroad Trainmen, [5 Cir.] 336 F.2d 172, 181 (1964). We have consistently so held in a long line of decisions. Railway Clerks v. Florida E.C.R. Co., 384 U. S. 238, 244 [86 S.Ct. 1420, 16 L.Ed.2d 501] ([5 Cir.] 1966); [Brotherhood of] Locomotive Engineers v. Baltimore & O. R. Co., 372 U.S. 284, [83 S.Ct. 691, 9 L.Ed.2d 759] (1963); [Order of] Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, [80 S.Ct. 761, 4 L.Ed.2d 774] (1960); Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 725, [65 S.Ct. 1282, 1290, 89 L.Ed. 1886] (1945).

6. *See* Chicago & North Western Ry. Co. v. United Transp. Union, 402 U.S. at 579, n. 11, 91 S.Ct. at 1736:

> While we have no occasion to determine whether § 2 First requires more of the

parties than avoidance of "bad faith" as defined by Judge Magruder in Reed & Prince [N.L.R.B. v. Reed & Prince Mfg. Co., 205 F.2d 131 (1 Cir.)], *supra*, we note two caveats. First, parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes. Cf. Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383 [89 S.Ct. 1109, 22 L.Ed.2d 344] (1969). Second, great circumspection should be used in going beyond cases involving "desire not to reach an agreement," for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements. See n. 19 *infra.*
> N. 19 (402 U.S. at 583, 91 S.Ct. at 1738) refers to the limitations found in § 8(d) of the National Labor Relations Act on the granting of strike injunctions, as follows:
> > Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), was added precisely because of congressional concern that the NLRB had intruded too deeply into the collective-bargaining process under the guise of enforcing the

7. See note 7 on page 962.

writing for the majority in *Chicago & N. W. Ry.*, was not unmindful of the inherent dangers in the Court's holding. Recognizing first that the party who sought to maintain the status quo might be reluctant to compromise during negotiations, given the hope of indefinitely postponing resort by the other party to self-help after exhaustion of the Act's procedures, Justice Harlan stated (402 U.S. at 583, 91 S.Ct. at 1738):

. . . Finally, the vagueness of the obligation under § 2 First could provide a cover for freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place.

He then concluded with this warning (402 U.S. 583–584, 91 S.Ct. at 1738):

These weighty considerations indeed counsel restraint in the issuance of strike injunctions based on violations of § 2 First . . . Nevertheless, the result reached today is unavoidable if we are to give effect to all our labor laws—enacted as they were by Congresses of differing political makeup and differing views on labor relations—rather than restrict our examination to those pieces of legislation which are in accord with our personal views of sound labor policy. See Boys Markets [Inc.] v. Retail Clerks [Union] Local 770, 398 U.S. 235, 250 [90 S.Ct. 1583, 26 L.Ed.2d 199] (1970).

 Two fundamental principles emerge: First, this Court must examine the parties' conduct in negotiations and bargaining to determine whether each approached the bargaining process in "good faith" and thereafter continued to bargain in "good faith." Second, as both the majority and minority opinions make clear, a United States District Court should not lightly use its power to enjoin self-help in a situation such as confronts this Court. It is against this

---

duty to bargain in good faith. See NLRB v. American National Insurance Co., 343 U.S. 395, [72 S.Ct. 824, 96 L.Ed. 1027] (1952); NLRB v. Insurance Agents' International, 361 U.S. 477, [80 S.Ct. 419, 4 L.Ed.2d 454] (1960).

7. Justice Brennan wrote a scathing dissent in which he was joined by the late Justice Black and Justices Douglas and White. He first defined the question presented (402 U.S. at 588, 91 S.Ct. at 1741):

This case presents the question whether, in a major dispute, a District Court may enjoin self-help measures after the completion of the statutory procedures if it determines that a party has not made "every reasonable effort" to reach agreement as required by § 2, First. Underlying this question is the corollary one, to what extent a District Court may inquire into collective negotiations in determining whether a party has complied with its statutory duty.

He made it clear he saw § 2 First as judicially enforceable only "to the extent of requiring the parties to sit down at the bargaining table and talk to each other." [citing Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937)]. He then interprets the majority's holding (402 U.S. at 596, 91 S.Ct. at 1744):

. . . In essence, the Court holds that a district court has the duty under § 2 First, to assess the bargaining tactics of each of the parties *after* the entire statutory scheme has run its course. If, then, the court determines that a party had not exerted sufficient effort to reach settlement, it should enjoin self-help measures, and, if such action is to make any sense within this statutory scheme, remand the parties to some unspecified point in the bargaining process. Such a notion is entirely contrary to the carefully constructed premise of the Railway Labor Act. [emphasis in original]

He also found this frailty in the majority's holding (402 U.S. at 597, 91 S.Ct. at 1745):

. . . [T]he result reached today will destroy entirely the carefully planned scheme of the Act . . . Underlying the entire statutory framework is the pressure born of the knowledge that in the final instance traditional self-help economic pressure may be brought to bear if the statutory mechanism does not produce agreement . . . The Court's decision will effectively destroy the scheme of gradually escalating pressures. . . .

background and with these basic guidelines in mind that we now analyze the proofs before this Court.

Our analysis is aided to a degree by drawing contrasting lines between the factual underpinnings of *Chicago & N. W. Ry. Co.* and the case at bar.

The District Judge in *Chicago & N. W. Ry.*, upon remand, found the Union guilty of "bad faith" bargaining, but precedential value in that finding is lacking for us. First, the Union there had simply refused to negotiate at all on employer counterproposals. No such claim is made here. Secondly, in that case the Union insisted that the carrier accept the same contract terms negotiated by the Union with other railroads. This position was taken after the Union itself had successfully resisted the carrier's attempt to engage in national, multi-employer bargaining, the Union having insisted on bargaining with the plaintiff railroad alone. Here, the Union demand for job protection made no reference to the contract provisions of any other carrier, and, in fact, was not patterned on any railroad's collective agreement. Contrary to plaintiffs' contentions, the Union did not insist on the type of clause embodied in the Penn Central merger protective agreement. Throughout the negotiations the Union offered alternative proposals to that in its initial § 6 Notice, designed to provide some protection for its members but different in terms and effect from that of the 1964 Penn Central agreement, which, we were told, even withheld severance pay under certain circumstances from released employees. The evidence demonstrates—and this Court so finds—that the Union's, § 6 job and wage protection demand arose conceptually, not from the Penn Central 1964

merger agreement, but from the Union's affiliative relationship with the International Longshoremen's Association. *See* Ex. A to Murphy Affidavit, "General Cargo Agreement." Given this origin, the job protection principle asserted was never in the context of "we'll accept nothing more nor less than that contained in the Penn Central merger agreement" and it is so found as a fact. Accordingly, aside from the abstract rule of law promulgated by the Supreme Court, *Chicago & N. W. Ry.* offers no support for plaintiffs' position.[8]

The plaintiffs' claim of Union "bad faith" is founded first upon a general charge of intractable, unyielding, adamant, stubborn and undeviating holding to a position. What does the law require?

In Atlantic Coast Line R. Co. v. Brotherhood of Railroad Trainmen, 262 F. Supp. 177, 183 (D.D.C.1967), aff'd in part and rev'd in part sub nom., Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Co., 127 U.S.App. D.C. 298, 383 F.2d 225 (D.C.Cir. 1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968), it is said that good faith bargaining under the Act suggests:

. . . [A]n obligation to negotiate genuinely and sincerely with the aim of amicably settling the differences between the parties and concluding an agreement. It is not sufficient to appear at a conference or a meeting with the other party and to submit an offer, or to make a demand, and yet to decline to argue its merits, or to refuse to entertain or discuss a counter-proposal. It is not a genuine negotiation to indicate that the other party has no choice except to accept

---

8. Job protection is of course, in railroad mergers, not simply a matter of collective bargaining. Section 5(2)(f) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (f) provides that in mergers and consolidations "the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected" for a period of four years. *See*

Norfolk & Western Ry. Co. v. Nemitz, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971), for the most recent recount of the legislative history of this provision. *See also* Shaughnessy et al. v. Penn Central Transportation Co., 454 F.2d 1223 (3 Cir. 1972), for reference to 1964 Penn Central Merger Agreement.

the offer or accede to the demand. The service of an ultimatum does not constitute a negotiation.

On the other hand, on appeal in that case the Court of Appeals said (383 F.2d at 229):

. . . [T]he Act does not require efforts clearly at war with reality.

*See also* American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 794 (S.D.N.Y.1958): "The requirement of good faith bargaining is really a requirement of absence of bad faith. . . . "; Norfolk & P. B. L. R. Co. v. Brotherhood of Railroad Trainmen, 248 F.2d 34, 45, n. 6 (4 Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958): "The negotiations required by the Act is the same 'good faith' bargaining required by the Labor Management Relations Act. . . . "

Ordinarily, such generalities would lend little assistance to the judicial quest for the resolution of what conduct constitutes "good faith" under the Act. Operating here, however, as we do, under the self-restraint enjoined upon us by the Supreme Court (402 U.S. at 583, 91 S.Ct. at 1738, 29 L.Ed.2d 187: "These weighty considerations indeed counsel restraint in the issuance of strike injunctions based on violations of § 2 First. . . . "), these judicial expressions serve as a further caution against indulging in "freewheeling judicial interference" (402 U.S. at 583, 91 S.Ct. 1731).

Well sifted, plaintiffs' charge here really is that the Union never completely surrendered its demand for job protection. Yet we know of no law—and have been cited to none—that requires it do so. We find as a fact that there were several modifications, each in turn a recession from the one preceding it, offered by the Union. We were presented with no evidence of an abrasive bargaining posture, or a failure to attend conferences, or a refusal to listen to or bargain on any of plaintiffs' proposals. To the contrary, the evidence is all the other way. During the course of nego-tiations the May 28, 1971, agreement, settling in part the disputed issue on salaries, was reached. The job protection demand was not used to block this achievement by the parties. In that very agreement the Union agreed to set up a standing committee to resolve the job protection issue. Moreover, there were written proposals which varied the original demand. Had the Union been intent on just "going through the motions," bent upon reaching no agreement (Chicago & N. W. Ry., 402 U.S. at 579, n. 11, 91 S.Ct. 1731), it would have been ingenuous indeed to have marked its trail with the written word.

In Pan American World Airways, Inc. v. Flight Engineers Intern. Assn., PAA Chapter, 306 F.2d 840 (2 Cir. 1962), the plaintiff argued that the Union's continued insistence on a mandatory crew complement represented a lack of good faith and a failure to exert every reasonable effort toward reaching agreement under § 2 First of the Act. In rejecting this argument, the Court stated (at p. 849):

In the present case the only evidence advanced of failure to exert every reasonable effort is insistence, in response to Pan American's proposals as to crew complement, on the requirement of the "A and P license" for flight engineers. There is no claim that the Union has not met with the employer whenever requested to do so over the many months of negotiation nor that the Union has not, apart from its insistence on this one item, participated in the give and take of these negotiations in complete good faith.

As to the issue itself, it would seem on its face to be an entirely proper subject for collective bargaining and one on which either of the parties might lawfully insist. . . .

*See also* Chicago, Rock Island & Pacific R. R. Co. v. Switchmen's Union, 292 F.2d 61 (2 Cir. 1960), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962), where the carriers contended that the Union's failure to abandon a proposal to which the railroads refused

to agree amounted to bad faith bargaining. There, as here, the union membership had rejected the employer offer and the Union during the negotiations had presented other alternative proposals for achieving its basic objective. In reversing the preliminary injunction granted by the District Court, the Court of Appeals stated (at 70):

> We find nothing in this history to show the Union simply went through the motions of bargaining. The controversy was that most intractable of all types of labor disputes—a question of principle. From the carrier's standpoint the Union's refusal to accept the "pattern" was indeed arbitrary, involving not only larger increases to the switchmen than to other crafts but the possibility of a chain reaction. Yet from the Union's standpoint, acceptance of the "pattern" would continue the very "inequity" of which they were complaining, sincerely so far as the record shows, whether justifiably or not. The carriers say the Union negotiators should at least have recommended the settlement, appellants respond there was nothing in the negotiators' simply putting up to the men whether to take the benefits they had obtained and shelve the inequity issue, or to press the latter even if this meant invoking the ultimate weapon. We should not suppose it to be bad faith for an employer's representatives to report a proposal as the best obtainable without taking a strike but still as something they did not recommend; we see no reason for a different rule as to a union's. The evidence is convincing that after the vote the Union negotiators did not stand on the original demand for a 12% increase; they made suggestions whereby the increases would conform to the Union's ideas of equity even though the total resulting wages still would not. The reasons for the carriers' rejection of these suggestions are understandable, but that does not make the Union's conduct so wholly arbitrary as to pass beyond the bounds

of good faith endeavor to reach agreement. Certainly the parties had reached the end of the bargaining road if their conduct were being tested under § 8(d) of the Labor Relations Act— neither would have been compelled "to agree to a proposal" or to make "a concession." See N.L.R.B. v. United Clay Mines Corp., 219 F.2d 120, 125–126 (6 Cir. 1955); Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1412–1422 (1958). Assuming, as we do, that the Railway Labor Act imposes a somewhat greater duty to endeavor to reach agreement, it no more required the switchmen to abandon all efforts to correct what they deemed an inequity than it compelled the carrier to depart from the "pattern" of settlement with other crafts.

The Union here, after exhaustion of the mandatory procedures of the Railway Labor Act, continued to negotiate without striking for several months. Indeed, it entered into the May 28, 1971, agreement on salaries, and two written extension agreements under which it waived the right to strike during a period of further negotiation.

■ Accordingly, this Court finds that the plaintiffs' charge of the Union lack of good faith in its bargaining and negotiating is without support insofar as it rests upon allegations of a refusal to bargain and negotiate in the traditional sense of these terms. We find that in its approach to the negotiations the Union did not bargain on a "take it or leave it basis" and that it manifested a willingness to compromise, modify, and soften its initial demands. In thus assessing plaintiffs' claim, we note that it was made for the first time in litigation. Nowhere does it appear in the record that plaintiffs ever complained to the Union or to the mediator during the negotiations that the Union was not adhering to good faith bargaining principles.

Plaintiffs next assert as an element of their "bad faith" charge against the defendants that the Union's job protection demand is not a mandatorily bargainable one in that it is without precedent

in the railroad industry other than in connection with mergers or consolidations. Credible evidence to the contrary was produced. Thus it appears that three of the four plaintiffs herein were in fact parties to a collective bargaining agreement providing for severance pay and certain job and wage protection. This agreement, dated December 12, 1960, was negotiated for the carriers by the same multi-employer bargaining unit as here, the New York Harbor Carriers' Conference Committee, with a Union representing Marine Oilers. Also produced herein was another agreement, the "non-op stabilization agreement of February 7, 1965," applicable to marine engineers employed by the signatory carriers, and providing a measure of job protection. Plaintiffs seek to dilute the effect of this exhibit because it contemplated a consolidation of seniority districts. Counsel did concede, however, that their clients were signatories to the agreement.

Still dealing with the question of bargainability, plaintiffs' representative never charged during negotiations that the job protection demand was not bargainable under the Act. The charge was first made in the Complaints and in Court. The testimony adduced by the plaintiffs on this issue came from the aforementioned Mr. Carroll. He testified that the concept of a guaranteed wage (and job protection) was compatible with the "concept of wages" in the railroad industry only in the case of a merger where there is a reduction in work force generating payroll savings. He made specific reference to the Penn Central merger of 1964 and pointed out that in connection with that merger the Penn Central employees, through the Union which is a defendant in this case, had achieved a certain form of job protection. Mr. Carroll further testified that he knew of no wage protection concept in the railroad industry where jobs were reduced or eliminated because of economic fluctuations rather than mergers or consolidations.

This Court, however, gives Mr. Carroll's testimony on the matter of bargainability no weight in view of what transpired during the lengthy negotiations hereinabove mentioned. The job protection demand, as has earlier been stated, was set forth in the § 6 Notice served by the Union in September, 1969. Mr. Carroll responded to this notice by letter dated September 9, 1969. He did find at least one element (not that related to job protection) of the Union's § 6 Notice improper in that it set forth that which was "not a proper subject for mandatory collective bargaining and (thus) is outside the ambit of the Railway Labor Act." He took no exception at all to the job protection demand except to the extent that he pointed out that he had read the "attachment concerning employee protection" as it related to a certain merger proceeding involving the Erie Lackawanna. Mr. Carroll said that he was "at a loss to understand your request, since the Erie Lackawanna Railway Company is not involved in these merger proceedings. . . . " Obviously, therefore, Mr. Carroll had taken careful note of the employee protection provisions in the Union notice, but did not find them nonbargainable on September 9, 1969. This is not without significance in view of Mr. Carroll's background. Presently he is General Manager of Labor Relations at Erie Lackawanna. For the last 13 years he has been in labor relations and his experience includes 3 years of service on the National Railroad Adjustment Board which has as its primary duty the disposition of claims by employees against railroads in the labor field and therefore has as "its entire work" the interpreting of contracts.

Mr. Carroll never complained to any Union representative at any time, in or out of the presence of a mediator, that the job protection demand was not bargainable. His actions, and the action taken by the Committee and the plaintiffs during the course of the negotiations, were consistent only with

bargainability of that demand. For example, Article II of the interim agreement of May 28, 1971 (Ex. P-17) makes specific mention of job protection and the establishment of a standing committee made up of management, labor and a neutral representative, to work to resolve this problem in the negotiations. Additionally, the exhibits tendered by the plaintiffs (Exs. P-20 and 21) to manifest Committee offers to the Union do not state that the carriers claim that the job protection demand is nonbargainable.

The plaintiffs' recently adopted position of nonbargainability is based in large part upon the charge that the Union derived the concept of job protection from the aforementioned Penn Central merger agreement of 1964 where, as has been said, it had been included because of the diminution in jobs brought about by the merger. Plaintiffs reason from this assumed premise that the Union's demand in the instant negotiations is therefore a nonbargainable one since there is not involved in these proceedings any merger with consequent job diminution. Whether or not the argument of the plaintiffs is sound, its factual premise is not. The Union defendant in this case is affiliated with the International Longshoreman's Association and, as this Court has hereinabove found, the job protection demand asserted in these proceedings is taken from the ILA contract. (See Murphy Affidavit, pp. 4–5).

■ Based upon the foregoing, this Court finds that the job protection concept is recognized and well known in collective bargaining in the railroad industry, and is not limited to mergers and consolidations. It follows that the Un-

ion's job protection demand herein was in fact and law a bargainable demand and was at all times during negotiations treated as such. See Order of R. R. Telegraphers v. Chicago & N. W. Ry. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1962).

The third basis asserted by the plaintiffs for their charge that the Union did not bargain in good faith is that the Union allegedly indulged in "whipsaw" tactics.[9] The core of this contention has to do with the Union entering into a separate agreement with Penn Central on December 14, 1971, followed by the Union's refusal thereafter to enter into an agreement on the same terms with the plaintiffs in this action. The factual support tendered by the plaintiffs for this argument includes these circumstances, some of which have been hereinabove set forth but which will be repeated: Penn Central was originally one of the members of the Committee along with the plaintiffs herein. Indeed, from July, 1971, until Penn Central's withdrawal from the multi-employer unit of the Committee, the chairman of the Committee was a Penn Central employee, Mr. Robert Brown. It is also clear that on November 29, 1971, Penn Central decided to withdraw from the Committee and thereafter negotiated on its own with the Union bargaining representative. It is against this background that the plaintiffs make the following claim (Memorandum of Law of The Baltimore & Ohio Railroad Company, p. 7):

> The Union's call for a whipsaw strike and picketing against B & O and the other carriers remaining in the multi-employer bargaining unit, while not striking a former member of the unit,

---

9. *See* NLRB v. Truck Drivers Local Union, 353 U.S. 87, 90 n. 7, 77 S.Ct. 643, 644, n. 7, 1 L.Ed.2d 676: "'Whipsawing' is the process of striking one at a time the employer members of a multi-employer association." There presented was a strike, and threatened strikes in the future, "with the 'calculated purpose' of causing 'successive and individual employer capitulations.'" 353 U.S. at 91, 77 S.Ct. at 645. *See also* Delaware and

Hudson Ry. Co. v. United Transp. Union, 450 F.2d 603 at 613, n. 21 (D.C.Cir. 1971), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971), where the carriers defined "whipsawing" as the tactic of striking an individual carrier member of a national bargaining unit to compel that carrier "to sue for a separate peace—to beg for a separate agreement with the striking union."

Penn Central, a stiff competitor of B & O and the others, but rather entering into a separate agreement with Penn Central and refusing to extend a similar agreement to B & O and the others, violates Section 2, First and Second of the Railway Labor Act, 45 U.S.C.A., Sec. 152, First and Second, and therefore the whipsaw strike and picketing should be preliminarily enjoined.

This Court does not regard the conduct of the Union in its negotiations in this matter as amounting to "whipsawing" the plaintiffs.

Plaintiffs rely principally upon two cases: Delaware & Hudson Ry. Co. v. United Transp. Union, 450 F.2d 603 (D.C.Cir., 1971), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed. 689 (1971) (the *D&H* case) and International Ass'n of M & A Wkrs. v. Nat'l. Ry. Labor Conf., 310 F.Supp. 905 (D.D.C.1970) (the *Alton* case).

In the *Alton* case, in the course of a labor dispute, the carriers had reached an understanding with three of the unions with whom they had been negotiating but an agreement could not be reached with one of the unions and thereafter all of the unions struck one of the railroads which had been a member of the nation-wide bargaining group of carriers. The Court granted a preliminary injunction to the carriers against the strike. Its reasoning steps were as follows: First, national handling of carrier-union disputes, while not expressly compelled by the Act, is legal and in some circumstances may even be obligatory; Second, national handling in the case before the Court was appropriate and obligatory; and Third,

. . . By initiating and negotiating the dispute on an obligatory national basis and then striking the carriers on an individual basis it seems clear that the unions have violated their duty to "exert every reasonable effort to make * * * agreements * * * and settle disputes." Having begun on a national level it is incumbent upon the parties to continue to deal on a national level even after the procedures of the Railway Labor Act have been exhausted. To act otherwise would take on the character of bad faith bargaining.

The Court of Appeals for the District of Columbia Circuit in the *D&H* case, closely analyzing *Alton*, interpreted *Alton* as resting upon a determination "that the duty to bargain collectively on a multi-employer level is violated when a union 'attempts to force individual agreements' by striking individual members." (450 F.2d at 609).

*D&H* further points out that the District Court in *Alton* had relied upon an NLRB decision [Int'l Union of Operating Engineers, Local 825, 145 NLRB 952 (1964)] and, likening the necessity for good faith bargaining under the National Labor Relations Act with that under the Railway Labor Act, the district judge in *Alton* had found that having once commenced bargaining with a multi-employer unit (the Association), a Union could not lawfully strike or otherwise coerce the Association employer members with the object of causing them to break off from the Association and execute individual contracts with the Union. (450 F.2d at 609).

Under the foregoing analysis of *Alton*, as presented by the Court of Appeals for the Circuit in which *Alton* was decided, it is clear that Alton does not govern the case at bar. Here the defendant Union did not assert its right to strike against Penn Central separately while Penn Central was still a member of the Committee, thus compelling Penn Central's splitting off from the railroad's bargaining unit. Penn Central voluntarily withdrew from the Committee and opened separate negotiations with the Union, in the presence of a Board mediator. Unlike *Alton*, here there was no Union effort to "pick off" one of the members of the Committee, by a strike against that member, in order to compel it to bargain separately, and neither on November 29, 1971 (when Penn Central withdrew its power of attorney), nor on December 14, 1971 (when the plaintiffs

were informed of the separate agreement between the Union and Penn Central), did the plaintiffs so contend.

Nor is the holding in the *D&H* case applicable to the case at bar. Thus the Court there stated (450 F.2d at 610):

> In our view the litigation before us is properly governed by the legal conclusion that when collective bargaining on a national handling basis has come to an impasse and all procedures of the Railway Labor Act have been exhausted, it is not unlawful for the Union to call a strike against some or a few of the carriers in order to put pressure on the railroads to reach a national multi-employer agreement.

The Court further stated:

> . . . The Railway Labor Act defers and delays, but in the last analysis it does not deny, a Union's right to call a strike. That right of self help has been reached in the case before us. The courts are not free to terminate or qualify that right, except in pursuance of authority granted by Congress. No such authority appears in the wording of the Railway Labor Act. Any doctrine that the right to strike may be limited by implication must be carefully confined. The Norris-LaGuardia Act has withdrawn the power of the Federal courts to issue injunctions in labor disputes. That prohibition is subject to an overriding doctrine permitting the issuance of an injunctive order in order to enforce compliance with the requirements of the Railway Labor Act. The obligation to bargain collectively may fairly comprehend a duty to bargain on a national handling basis, and to seek to reach national agreement. But the Union has bargained on a national basis, and it seeks to reach a national agreement. It now has the right to strike and to use economic pressure so long as it does not violate its obligation to continue to bargain collectively. As *Alton* points out, the duty is to bargain in good faith, which means an absence of bad faith, and an effort to pursue single agreements may be tak-

en as undercutting an obligation to conduct national bargaining in good faith. But an effort to pursue a national agreement by increasing the use of non-violent economic pressure is subject to no such condemnation. [*footnote omitted*] (450 F.2d at 611).

In *D&H* the carriers had argued that a selective strike against two of the railroads which had been represented by the multi-employer bargaining unit would have the foreseeable effect of coercing the struck carriers into withdrawing from multi-carrier national handling of the dispute and to seek to make the best possible individual agreements with the Union through their respective officials. (450 F.2d at 612). Thus it is seen that the *D&H* case involves the concept of a so-called "selective strike" with the carriers therein contending that an individual carrier who is struck would have to beg for separate peace, resulting in the destruction of the multi-employer bargaining unit. (450 F.2d at 613).

As the Court of Appeals points out in the *D&H* case (450 F.2d at 614), ". . . [T]he ultimate issue is not what the carriers thought would happen but the Union's good faith. . . ." Put into the context of that case, there must be a Union intention of causing a carrier, which it strikes, to desert the multi-employer bargaining unit and settle with it on an individual basis.

The Court, in finding no breach of good faith bargaining, had before it testimony from the Union representative that the Union had called the strikes because it "felt the strikes would put pressure on the struck roads to tell their representatives on the national group to settle the issue." (450 F.2d at 615). The Court stated: ". . . We cannot say that a selective strike is inherently incompatible with the objective of reaching a national agreement. . . ." (450 F.2d at 615).

Not only is the *D&H* holding of no support for plaintiffs' claim. There is in fact certain persuasive reasoning by the Court therein which redounds to the detriment of plaintiffs' position.

When Penn Central, in the case at bar, withdrew, on its own, from the multi-employer bargaining unit on November 29, 1971, what was the Union to do? Could it have refused to bargain with Penn Central once the latter had thus elected to withdraw from the Committee in order to negotiate separately with the Union? The plaintiffs did not so contend at the time. On this point, the Court of Appeals in the *D&H* case stated in dealing with a strike-induced carrier withdrawal assumption (450 F.2d at 617):

> . . . A strike begun with a lawful purpose may become illegal because of methods used in carrying on the strike, *and it may be that this might apply to refusal to bargain with an employer who has withdrawn from the multiple unit.* But such determinations cannot fairly be made in advance of ascertaining the factual perspective (Emphasis supplied).

*See also, Id.,* at 618.

■ Thus, the plaintiffs' claim that the Union violated the Act by "whipsawing" the plaintiffs herein must be rejected. There is not a shred of evidence that the defendants sought to compel or coerce any single member of the multi-employer group to leave that group and bargain separately. There is no proof in the record to indicate that the Union singled out one carrier for selective strike action in the hope that the struck carrier would capitulate to the Union's terms. There is no evidence that the Union did anything with an intent to disrupt national or territorial bargaining. Penn Central's voluntary withdrawal was without inducement by the Union. It has been suggested that the Penn Central employees already had a measure of job protection by reason of the Penn Central merger agreement of 1964 and that this may have been a reason why Penn Central withdrew. Of course, this Court also must take judicial notice of the fact that Penn Central is currently involved in a Chapter 77 reorganization and that its financial structure may well have dictated that it withdraw. It is al-

so clear that the Union representative who submitted the agreement which Penn Central had accepted, recommended its rejection but the Penn Central employees, overriding this recommendation, accepted the agreement. Again, it has been suggested, not illogically, that they did so because they already had a measure of job protection by reason of the aforesaid merger agreement, and thus were willing to abandon the demand its representative had been pressing in negotiations. Why they did so, however, is not significant; what is significant is that the Union cannot be charged with having selectively singled out Penn Central for coercive action in order to split it away from the multi-employer bargaining group. Where then is the "whipsaw"? Where then is the "bad faith"? This Court finds neither.

Nor is it a logical assertion on the part of the plaintiffs when they contend that having signed an agreement with Penn Central, the Union should have tendered to them the same terms. That agreement cannot be read by itself. It must be read in conjunction with the earlier job protection clause of the 1964 merger agreement. The Union was not obliged to abandon its key demand as to job protection as against those carriers which continued to refuse to accord to its employees represented by the Union any form of job protection and it follows that it was not bound to refrain from engaging in measures of self-help. Again, this Court finds no "whipsaw" and no "bad faith."

■ The granting or denying of a motion for a preliminary injunction pending final determination on the merits is ordinarily within the sound discretion of the court. Prendergast v. New York Telephone Co., 262 U.S. 43, 50–51, 43 S.Ct. 466, 67 L.Ed. 853 (1923), but it is a discretion which is relatively closely confined. Thus, the Court of Appeals of this Circuit, in Mixing Equipment Company v. Philadelphia Gear, Inc., 436 F.2d 1308, 1315 (3 Cir. 1971), stated:

> . . . Where a full hearing has been held and all factual and legal issues re-

lating to liability have been determined in favor of the party seeking injunctive relief, and where the trial court has found a likelihood of irreparable injury pendente lite, a preliminary injunction is an appropriate remedy. . . ."

See also A. L. K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761 (3 Cir. 1971); Midland-Ross Corp. v. Sunbeam Equipment Corp., 435 F.2d 159 (3 Cir. 1970); United States Steel Corp. v. Fraternal Association of Steelhaulers, etc., 431 F.2d 1046 (3 Cir. 1970); Nelson v. Miller, 373 F.2d 474, 477 (3 Cir. 1967), cert. denied, 387 U.S. 924, 87 S. Ct. 2042, 18 L.Ed.2d 980 (1967); Kontes Glass Co. v. Lab Glass Inc., 373 F.2d 319 (3 Cir. 1967); Ikirt v. Lee National Corp., 358 F.2d 726 (3 Cir. 1966); Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569 (3 Cir. 1959).

 Under the foregoing authorities, the grant of a preliminary injunction is the exercise of a very far-reaching power never to be indulged except in a case clearly warranting it. To obtain such relief a plaintiff must establish a strong likelihood that he will prevail on the merits at a final hearing. It is a cardinal principle of equity jurisprudence that a preliminary injunction shall not issue in a doubtful case. Unless a court is convinced with reasonable certainty that the complainant must succeed at final hearing, the writ should be denied.

Against the background of these now well-settled propositions of law and the record made by the movants on the hearing, and giving consideration to the verified Complaints and affidavits as well, it is clear that no preliminary injunction should issue. The movants have not demonstrated a reasonable likelihood or probability of success at final hearing. For this Court to issue an injunction would be an abuse of discretion.

Plaintiffs' motions for preliminary injunctions are denied and it is so ordered.

Notwithstanding the denial of the motions herein, the Union continues under an obligation to conduct itself responsibly "even after the right of strike or self help comes into existence. . . ." (D&H, supra, 450 F.2d at 622). While this Court does not intend gratuitously to inject itself into the collective bargaining process, it would seem that first, no strike should hereafter be called without reasonable notice, and, second, that during the "reasonable notice" period, the parties, acting in the public interest, and under the Act, should resume "good faith" collective bargaining.

The temporary restraining orders heretofore entered herein are vacated.