**JAPAN AIR LINES COMPANY, LTD.,**
Plaintiff,

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO ("IAM"), et al.,**
Defendants.

**No. 75 Civ. 166.**

United States District Court,
S. D. New York.

Feb. 19, 1975.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for plaintiff; Murray Gartner, Edward A. Brill, New York City, of counsel.

Vladeck, Elias, Vladeck & Lewis, P. C., New York City, for defendants; Sheldon Engelhard, Robert Jauvtis, New York City, of counsel.

ROBERT J. WARD, District Judge.

Plaintiff, Japan Air Lines Company, Ltd. ("JAL"), a carrier engaged in the operation of an airline system for the carriage by air of passengers, property and mail in overseas and foreign commerce, and subject to the provisions of the Railway Labor Act ("RLA"), 45 U. S.C. §§ 151–152, 154–163, 181–188, commenced this action against defendant International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM"), the collective bargaining representative of certain of its employees in the United States. In addition to IAM, the complaint names as defendants IAM District Lodge No. 151 ("District 151") which has jurisdiction over the members of the IAM employed by JAL in the United States and certain individuals who represented JAL employees in negotiations over proposed changes in the existing labor agreement between JAL and IAM. The individual defendants who are employed by JAL are also sued as representatives of a class consisting of all employees of JAL represented by IAM.

The complaint charges that throughout negotiation and mediation of pro-

posed changes in the aforementioned labor agreement IAM has insisted on an unlawful change in the "Scope" clause of the agreement as a condition of reaching a new agreement. It is alleged that the IAM proposal that JAL hire its own employees to perform work which has never been performed by JAL employees, but which has heretofore been contracted out, is directed towards expansion of the IAM's own membership and its control of work, not its representation of employees and that the proposal is not related to the rates of pay, rules or working conditions of JAL's present employees within the meaning of RLA §§ 2, First, 6, 45 U.S.C. §§ 152, First, 156.

It is further alleged that the IAM, by its proposed change in the "Scope" clause of the agreement, seeks to bargain with JAL over fundamental management decisions unrelated to rates of pay, rules . or working conditions of JAL's present employees and that JAL has no obligation under the RLA to bargain with the IAM over this proposed change. JAL seeks to enjoin a strike by defendants on the ground that a strike would be unlawful under the RLA because (1) defendants have not fulfilled their statutory obligation to make every reasonable effort to reach an agreement and (2) an object of such strike would be to force acceptance by JAL of the IAM's allegedly unlawful demand.

The defendants, by their answer, deny that they have violated § 2, First of the RLA. They allege that the "Scope" changes proposed by the IAM's § 6 Notice are bargainable and that JAL has violated its § 2, First duty in refusing to negotiate with the defendants over these proposals. They further allege that although changes of the sort contemplated by the IAM's § 6 Notice were the subject of prior negotiations be-

tween the parties and formed part of the last collective bargaining agreement and negotiations for a new collective bargaining agreement commenced November 6, 1973, plaintiff did not maintain that the "Scope" proposal was a nonbargainable management right until November 13, 1974. They, therefore, allege that plaintiff is not entitled to equitable relief because it does not come into this Court with "clean hands."

This action was commenced after negotiations which had been conducted intermittently over a fourteen-month period failed to achieve an agreement. Plaintiff applied for a temporary restraining order which, after an evidentiary hearing on notice to defendants and their attorneys, was granted on January 22, 1975, one day before the expiration of the 30-day "cooling-off" period provided by RLA § 5, First, 45 U.S.C. § 155, First.

The written agreement between the parties covering JAL's United States employees in the craft or class of airline mechanics, including ground service and ramp employees, became effective March 1, 1972, was to continue in effect until October 31, 1973 and thereafter was subject to change as provided by RLA § 6, 45 U.S.C. § 156. On or about September 28, 1973, pursuant to Article XXII of the agreement and RLA § 6, IAM served JAL with notice of approximately 75 proposed changes in the agreement. By letter dated October 1, 1973, JAL served notice of approximately 40 changes which it proposed.,

Negotiations began on or about November 6, 1973 in Honolulu at which time defendant Fusao Ogoshi, on behalf of IAM, read and explained all of the union's section 6 proposals, including four proposed changes in Article I.[1]

---

1. The four proposed changes in Article I Scope of Agreement were:
 Paragraph B. Add plant mechanics and radio & electronic mechanics.
 Paragraph D. Amend to provide that during the life of this Agreement, the Company shall phase out the contracting of

all work covered by this Agreement and employ its own personnel to perform such work.
Add new paragraph.
 The Company agrees that the positions and work within the scope of this Agreement belong to the employees cov-

The dispute in the Court focuses on the IAM's proposed change in Article I, Paragraph D, of the existing agreement ("the Scope proposal" or "Scope").

To understand the dispute, it is necessary to know something about the JAL operation in the United States. In connection with flights to Honolulu, New York, San Francisco, Los Angeles and Anchorage, JAL requires services in the following classifications: "Maintenance," "Plant Maintenance," "Ramp Service" and "Stores." JAL employees who are part of the bargaining unit represented by the IAM perform these services except that since the inception of its routes to the latter four cities, JAL has subcontracted its "Maintenance" requirements at all four cities, its "Plant Maintenance" requirements at San Francisco, Los Angeles and Anchorage, its "Ramp Service" requirements at Los Angeles and Anchorage, and its "Stores" requirements at Anchorage.

In 1972 the IAM, in its § 6 Notice to JAL, proposed modifications of Article I of the existing collective bargaining agreement, specifically, to provide that JAL employ at all locations in the United States its own personnel in the aforementioned classifications. Citing economic considerations, JAL declined to modify Article I. The National Mediation Board ("NMB") accepted jurisdiction of the dispute and appointed a mediator. Accepting a suggestion by the mediator, the parties agreed to the adoption of Appendices "D" and "E", letter agreements which became a part of the collective bargaining agreement.[2] As a

---

ered hereby and nothing in this Agreement shall be construed to permit the age of this Agreement or further to permit the Company to employ alien employees in such positions or work without written consent of the Union. Add new paragraph.

The Company agrees that it shall not layoff any employees in the bargaining unit during the term of this Agreement.

2. Appendix "D":

This letter will confirm the understandings reached in Mediation Conferences regarding the Union's request that the Company furnish a definite timetable for manning all Stations with Company employees, and for certain changes in ARTICLE I (SCOPE OF THE AGREEMENT).

The Company agrees that it will not contract out work at Stations where its IAM employees are currently doing work in the classifications (Crafts and Classes) covered by the Agreement, without prior notice to and negotiations with the Union (IAM).

The Company agrees to open certain jobs at JFK and at SFO, as follows:

A. Beginning no later than October 1, 1973, the maintenance work performed on the equipment in the Cargo Warehouse at JFK International Airport, New York, now performed by Mohawk, will be performed by employees of the Company who are members of the Union.

B. The Company employees in the classification of Plant Mechanics will perform work in connection with the maintenance and repairs of the ground equipment at SFO and at JFK as soon as the Company can lease adequate space to establish its own ground equipment maintenance facilities at each of said Stations.

The Company is currently making every effort to secure space for the ground equipment maintenance facilities at SFO and at JFK and will continue its efforts. Periodic progress reports will be made to the Union in connection with this matter.

In addition, there will be no layoffs (furloughs) as set forth in the Letter of Agreement between Japan Air Lines Co. Ltd., and the Union.

Appendix "E":

NO FURLOUGH

With regard to the Mediation Agreement reached May 18, 1973, the parties hereto agree that upon receipt by the Company from the Union of written notification that such Mediation Agreement has been ratified, the Company:

1. Will not during the period commencing with receipt of such notice of ratification and extending through the life of the Agreement, furlough any employee on the payroll on the date of receipt by the Company of such notice. Provided, however, the Company may furlough employees when any one or more of the following conditions exist:

A. An employee fails to exercise his seniority if it would enable him to remain in the employ of the Company in his then current classification.

B. The layoff is caused by:

(1) An act of God.

(2) A war emergency.

(3) Revocation of the Company's operating certificate or certificates.

result of the implementation of Appendix "D", the "maintenance work" performed on equipment in the Cargo Warehouse in New York which had been subcontracted to Mohawk Air Service is now being performed by JAL employees who are part of the IAM's bargaining unit.

Although American counsel had been consulted in 1972, and had allegedly rendered an opinion relating to JAL's legal obligation to bargain on "Scope", this opinion was never communicated to the IAM.

On November 6, 1973, as negotiations opened, the IAM proposed that during the life of the new agreement, JAL phase out the subcontracting of work in the aforementioned classifications at New York, San Francisco, Los Angeles and Anchorage, and employ its own personnel, represented by the IAM, to perform such services.

The parties met again on November 7, 1973 at which time Mas Yonemura, an attorney representing JAL, read and explained the company's Section 6 proposals, none of which concerned "Scope" except insofar as JAL proposed eliminating the no furlough provision contained in Appendix "E" of the existing agreement. The parties continued meeting on November 8, 1973 but discussed only outstanding grievances.

These grievances were again discussed when the parties next met in San Francisco on November 26, 1973. The following day, November 27, the parties discussed proposed changes in the agreement including not more than ten minutes devoted to the union's "Scope" proposal.

The testimony is in conflict as to whether JAL made any response to the latter proposal. Defendants' witnesses testified that JAL made no response.

The evidence, viewed in the light most favorable to plaintiff, indicates that JAL's response was that it wished to make no change in the "Scope" article. Although the negotiations continued on November 28, "Scope" was not discussed.

The meetings were recessed until December 15, 1973, at which time the parties resumed negotiations in San Francisco. In the course of meetings which took place on December 16 and 17, the IAM "Scope" proposal was again raised. According to plaintiff's witnesses, JAL's spokesman, Mr. Yonemura, replied that there was no change in the company's position with regard to this issue. Mr. Yonemura stated that JAL currently planned construction of a new cargo facility at San Francisco, where it planned to house its own plant mechanics but that JAL had no other plans to open new facilities due to uncertainty of future flight schedules, the fuel crisis, and a mounting operating deficit. The IAM requested information regarding the number of man hours included in the services rendered by Mercury Air Service and United Airlines, contractors performing services for JAL at Los Angeles and San Francisco. The company refused to divulge this information, stating it was confidential, a position which it again took at the hearing on its motion for a preliminary injunction. The IAM explained that it was concerned with the possibility of lay-offs of JAL employees as a result of the fuel crisis and that it considered it unfair for un-

(4) Grounding of a number of Company aircraft which would require reduction in force.
(5) A strike.
(6) Picketing of Company premises.
(7) Work stoppage which would substantially interfere with the operations of the Company.
(8) Any cessation of work because of circumstances beyond the Company's control.

2. Disciplinary layoffs are specifically exempt from this Agreement.
 This Agreement is made for and in consideration of the withdrawal by both parties of all disputed issues regarding the Scope of the Agreement arising out of the respective Section 6 Notices giving rise to the Mediation Agreement referred to above.

ion employees to be laid off while similar work was being performed by subcontractors. So far as the testimony reveals, this was the extent of the discussions concerning the "Scope" proposal. According to Wayne Kuramoto, a witness called by plaintiff, at most 15 or 20 minutes was devoted to this subject.

The final direct negotiations took place in Honolulu between January 15 and January 19, 1974. In the course of these sessions, "Scope" was again raised by the IAM and JAL once more indicated that its position with regard to this subject had not changed. According to the defendant Ogoshi, JAL's representatives never stated that the company could not or would not bargain on "Scope".[3] On the contrary, according to Mr. Ogoshi, the company gave reasons for not wanting to accept the union's "Scope" proposal, specifically, that it needed flexibility in relation to use of its manpower. In all, not more than 20 minutes were devoted to discussion of this subject. The remainder of the negotiations were devoted to other subjects. At the conclusion of this round of negotiations, the parties determined that they were deadlocked.

The Court finds as a fact that during each round of the direct negotiations the IAM raised the question of "Scope" and asked JAL to bargain on its "Scope" proposal. The Court further finds that JAL consistently refused to bargain on this issue at least to the extent that it insisted there should be no change in the existing agreement and that it refused to make any offer or counter-proposal with regard to this subject.

On January 25, 1974, JAL applied to the NMB, pursuant to 45 U.S.C. § 155, invoking the mediation service of the NMB with respect to the dispute over the proposed changes in the agreement. The NMB accepted jurisdiction of the dispute, docketed it as Case No. A–9520, and appointed a mediator.

The initial mediation session was scheduled to be held between June 25 and 29, 1974. On the first day, each side explained its proposals and "Scope" was discussed for 10–15 minutes. JAL was asked if it had any offer on "Scope" and indicated that because of its "economic situation" it did not. After the first day, the mediator became ill and the parties concluded the initial round of negotiations without the mediator, discussing all open items.

The second mediation session began on July 20, and concluded on August 3, 1974 with a new mediator in attendance. Two days of this session were spent in discussions concerning a pension proposal; however, no agreement was reached on this item. Work rules and overtime were also discussed.

On August 2, 1974, JAL gave the IAM a list of employees who were to be furloughed as the result of the fuel crisis. The next day, defendant Quick, speaking for the IAM, told JAL that the union had to have some change on "Scope". He explained that there was great concern with lay-offs and that the union bargaining committee could not recommend ratification of the proposed contract without something from the company on "Scope". JAL indicated that it had not changed its position and declined to offer anything on "Scope".

Negotiations resumed on August 26 and continued through September 3, 1974. All open items were discussed with JAL making substantial concessions on wages and indicating it was willing to offer the IAM just about what the union had settled for with United Airlines. However, the term of the proposed agreement differed from the term of the United Airlines agreement. JAL asked the IAM to take the proposed contract back to the membership for a ratification vote. Mr. Quick, on behalf of the IAM, agreed but indicated that the bargaining committee

---

3. The Court's recollection in this regard differs from the transcript which indicates the contrary.

could not recommend ratification unless JAL made some offer on "Scope" and that the membership was likely to vote the contract down absent some concession on "Scope". Within the next week the membership voted on JAL's contract offer. On September 10, 1974, the IAM notified JAL that the company's offer had been rejected by 97.2% of the membership.

The final mediation session under the auspices of the NMB was held on November 12 and 13, 1974.

On November 12, Mr. Quick again stated that the union had to have something on "Scope" to satisfy its members. According to Mr. Quick, the company responded by offering to put plant maintenance mechanics in San Francisco and plant maintenance and automotive mechanics in New York when JAL could lease appropriate space at both locations but that due to the financial condition of the company and the cost involved the company could not agree to anything further on the "Scope" proposal. The IAM rejected this offer deeming it already included in Appendix "D" of the existing agreement.

The following day, Shigeo Kasumi, JAL's Administrative Manager, the Americas, requested that "Scope" be put off until all other issues were considered. The IAM insisted that all open items were to be discussed, including "Scope".

Mr. Kasumi then said "Scope" was not a negotiable issue. Mr. Quick replied that it had always been a negotiable matter and that nothing in the law made it non-negotiable. At that point, the company representatives left the meeting.

On or about November 26, 1974, Kiichi Ito, JAL's Vice President, the Americas, in a letter addressed "To All IAM-Represented Employees", stated that "the Company has told the Union Committee that we will not bargain on 'Scope' or other issues not related to rates of pay or working conditions for our own employees."

On December 17, 1974, the NMB requested that the parties submit the dispute over proposed changes in their agreement to arbitration. JAL agreed to arbitrate all issues except "Scope". However, the IAM rejected the NMB's proffer of arbitration. Thereupon, the NMB served notice that its services were terminated December 23, 1974 and the IAM could thus strike on and after January 23, 1975. Despite this fact, the parties met voluntarily on January 15, 1975 with a mediator and discussed all open issues.

As noted above, on January 22, 1975, after hearing the parties, this Court issued a temporary restraining order prohibiting a strike and also prohibiting the parties from bargaining on "Scope". The restraining order was originally to expire on January 31 and was extended pending further hearings until February 10. Inasmuch as the hearings did not conclude until February 7 and the parties indicated that they could not file their proposed findings and conclusions before February 12, the Court extended the temporary restraining order until February 19, 1975.

In the interim, the parties continued bargaining on all issues other than "Scope". According to the union, the parties have not reached final agreement on fourteen issues, including wages, pensions, medical insurance, holidays, cost-of-living allowance, longevity pay and a no lay-off clause. According to the company, there are no substantial differences between the parties except the "Scope" issue.

*Jurisdiction*

This action arises under RLA § 2, First, 45 U.S.C. § 152, First. JAL seeks an injunction against the IAM's resort to self-help, claiming that the union acquired no right to strike because it violated its RLA § 2, First, duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes." In

Chicago and North Western Railway Co. v. United Transportation Union, 402 U. S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), the Supreme Court held that § 2, First, imposes a legal obligation upon management and labor that is judicially enforceable. It further held that the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 107, 108, did not deprive the district courts of jurisdiction to issue injunctions against strikes when such a remedy was the only practical and effective means of enforcing § 2, First. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337.

*The Standard to be Applied*

In holding that violations of § 2, First, are judicially enforceable by injunction, the court in *Chicago and North Western Railway, supra,* did not specify the standard to be applied in determining what constitutes a § 2, First, violation. However, the court cautioned that "great circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements." 402 U.S. at 579 n. 11, 91 S.Ct. at 1736.

■ This Court assumes that § 2, First, imposes a higher standard of negotiation efforts than is required by the National Labor Relations Act ("NLRA"), which merely requires the parties to "confer in good faith." The Court concludes that the proper standard to be applied in determining what constitutes a § 2, First, violation is whether the party charged with violation of its duty has merely gone through the motions of compliance with the Act's required procedures without a desire to reach an agreement. *Chicago and North Western Railway, supra* at 579 n. 11, 91 S.Ct. 1731; REA Express, Inc. v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, 358 F.Supp. 760 (S.D.N.Y.1973); Erie Lackawanna Railway Co. v. Lighter Captains Union, 338

F.Supp. 955 (D.N.J.1972). *See also,* Chicago, Rock Island and Pacific Railroad Co. et al. v. Switchmen's Union of North America, 292 F.2d 61 (2d Cir. 1961), cert. denied, 370 U.S. 936, 82 S. Ct. 1578, 8 L.Ed.2d 806 (1962).

■ Whether this standard has been met must be determined by the whole of the party's conduct at the bargaining table. *See* Kennedy v. Long Island Rail Road Co., 319 F.2d 366 (2d Cir.), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963). The mere inclusion of a non-bargainable demand in a Section 6 Notice, as extensive as the union's in this case, would not be grounds for barring resort to self-help over a dispute which had been adequately processed through the Act's mandatory procedures. *REA Express, Inc., supra,* 358 F.Supp. at 773–74. In labor negotiations of this sort, the parties at times, as a matter of tactics, start from an immoderate position. "Genuineness of negotiations does not necessarily depend upon the nature or reasonableness of the initial proposal." Atlantic Coast Line Railroad Co. v. Brotherhood of Railroad Trainmen, 262 F.Supp. 177, 185 (D.D.C.), aff'd in part, rev'd in part, 383 F.2d 225 (D.C.Cir.1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L. Ed.2d 839 (1968). Thus, the ultimate question in this case is did the defendants negotiate the Section 6 proposals with a sincere purpose to settle the dispute, or did they merely go through the motions of compliance with the required procedures with a "desire not to reach an agreement."

The plaintiff's position may be simply stated. It argues that throughout the negotiations the defendants conditioned agreement upon JAL's making concessions with regard to the IAM's "Scope" proposal. JAL argues that this demand was non-bargainable and, therefore, the IAM violated the standard here enunciated. The Court cannot agree with plaintiff's contention that the defendants conditioned agreement upon acceptance of their "Scope" demand. The Court, however, does find as a fact that

"Scope" was of major importance to the IAM and that the union's insistence upon bargaining on "Scope" and JAL's refusal to negotiate the issue were significant factors in the parties' failure to reach agreement.

Thus, the Court must, as a threshold question, determine the bargainability of the "Scope" demand.

### The Duty to Bargain on "Scope"

■ As a preliminary matter, this Court has the power to determine what subjects are within the ambit of "rates of pay, rules and working conditions" upon which the parties have a duty to bargain. "The question of which proposals are bargainable is one which, under the Railway Labor Act, may be decided by the courts. By their very nature, such questions cannot be settled by collective bargaining, and the Act does not provide for their settlement by . . . the National Mediation Board . . . ." Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Board, 410 F.2d 1025, 1030 n. 16 (D.C.Cir.1969). *See also*, Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 158–59, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); International Association of Machinists & Aerospace Workers v. Northeast Airlines, Inc., 473 F.2d 549 (1st Cir.), cert. denied, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972). Consequently, it is the duty of this Court to construe the statute.

■ The defendants argue that the only subjects which an employer has no duty to bargain about are those which are unlawful or expressly prohibited by the RLA. The Court cannot agree with this construction of the statute although the Court does agree with the defendants both that the parties may not bargain about unlawful subjects and that the "Scope" demand was not unlawful. Furthermore, the Court agrees that the parties *may* bargain about anything else. However, the question presented by this case is what subjects an employer and union *must* bargain about. That is, what is mandatorily bargainable under the RLA?

The Act speaks in words of limitation. There is only a duty to exert every reasonable effort to make agreements and settle all disputes "concerning rates of pay, rules, and working conditions." See Order of Railroad Telegraphers v. Chicago & North Western Railway Co., 362 U.S. 330, 339, 80 S.Ct. 761, 766, 4 L.Ed.2d 774 (1960).

The union relies on Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) as establishing subcontracting as a mandatory subject of collective bargaining. The union, however, reads *Fibreboard* too broadly. The court there merely held that "the type of 'contracting out' involved in this case—the *replacement* of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining . . . .. Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy." 379 U.S. at 215, 85 S.Ct. at 405 (emphasis added). The court noted that upon the facts of that case "to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." *Id.* at 213,[4] 85 S.Ct. at 404.

---

4. Courts have consistently refused to extend the duty to bargain recognized in *Fibreboard* to analogous management decisions which are more central to management's autonomous control over the direction of its business' operations. In Textile Workers Union of America v. Darlington Manufacturing, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the court held that an employer had an absolute right to terminate its entire business. In N.L.R.B. v. Acme Industrial Products, Inc., 439 F.2d 40 (6th Cir. 1971), the court held that the employer had no duty to bargain over its decision to relocate part of its manufacturing operations to another plant. Accord, N.L.R.B. v. Rapid Bindery, 293 F.2d 170, 176 (2d Cir. 1961). These NLRA cases carve out an area of managerial decision making within which the employer is not required to bargain.

Thus, *Fibreboard* did not decide that *all* subcontracting practices are the subject of mandatory collective bargaining. This case, in effect, is the reverse of *Fibreboard*. Here, the IAM seeks to require JAL to discontinue subcontracting practices it has followed since the inception of its business in the continental United States and hire its own employees to perform work at locations where such work has never been performed by JAL employees. *Fibreboard* is, therefore, not dispositive of the question presented in this case.

The concurring opinion of Justice Stewart more fully explicated the criteria which this Court should apply in determining whether this particular managerial decision is a mandatory subject of collective bargaining.[5]

> Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. . . . [T]hose management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area [subject to collective bargaining]. *Id.* 379 U.S. at 223, 85 S.Ct. at 409.

The cases decided under the RLA are of little guidance in resolving the question posed here. These cases deal with the duty of an employer to bargain with the union representing its employees when it proposes to make *changes* in the working conditions of its *existing* employees. *See, e. g.,* United Industrial Workers of the Seafarers International Union of North America v. Board of Trustees of the Galveston Wharves, 351 F.2d 183 (5th Cir. 1965); Detroit & Toledo Shore Line Railroad Co. v. Brother-

hood of Locomotive Firemen and Enginemen, 267 F.Supp. 572 (N.D.Ohio 1967), aff'd, 401 F.2d 368, (6th Cir. 1968) aff'd sub nom, Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). Here, JAL seeks to make no change in its operations. Rather, the union seeks to require the company to make such a change.

■ Cases under the RLA have, however, recognized that there is an area of managerial decision making within which the employer has no duty to bargain with the union representing its employees. In *International Association of Machinists, supra,* the court held that the airline had no duty to bargain with the union concerning its decision to merge with another airline. In *Detroit & Toledo Shore Line Railroad Co., supra,* the railroad argued that the establishment of a railway terminal is not bargainable because it was a managerial prerogative. The Court of Appeals stated:

> This argument would have great force if the District Court's judgment prevented the company from constructing physical facilities known as a "terminal" or from using such facilities as a terminal.
>
> 401 F.2d at 370

Thus, the Court holds that under the RLA, there is an area of managerial decision making or prerogative which is not within the ambit of mandatory bargaining so long as there is no change in the existing working conditions of present employees.

■ The question then becomes whether the IAM's "Scope" proposal falls into this area. Applying the relevant criteria, the Court concludes that it does.

■ The union bases its "Scope" demand on the need to provide JAL's

---

5. This Court reads the decision in Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 178–82, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) as adopting the rationale contained in Justice Stewart's concurring opinion.

present employees with job security. Job security is a legitimate and mandatorily bargainable subject. However, in the Court's view, implementation of the IAM's "Scope" proposal would only indirectly provide job security. The existing subcontracting practices of JAL do not have an immediate and direct effect on the job security of present employees.[6] *See International Association of Machinists, etc., supra* 473 F.2d at 556–57, 558. *Cf.* Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 178–82, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). On the other hand, the IAM's "Scope" proposal goes directly to JAL's right to control the direction of its business enterprise. It goes to the heart of the method by which JAL has chosen to operate its business. In this respect, it is not unlike the decision to build a new terminal. There are numerous decisions which an airline makes which affect the job opportunities of its employees. For example, what routes to establish, what types of airplanes to fly, how many flights to schedule, and what fares to charge. Yet, it cannot seriously be contended that an airline has an absolute duty to negotiate with the union representing its employees concerning these decisions. On the evidence presented, the subcontracting practices of JAL fall into this category.

The Court, therefore, holds that the union's "Scope" proposal is not a mandatory subject of bargaining, insofar as it seeks to require JAL to alter the method it has chosen for conducting its business. However, nothing in this decision should be construed as prohibiting the IAM from negotiating for contract changes which will insure the job security of JAL employees whom the IAM presently represents.

Accordingly, JAL did not violate § 2, First, by refusing to bargain on "Scope".

*Preliminary Injunction*

The question at this juncture is whether the IAM violated its § 2, First, duty by insisting on bargaining on the "Scope" proposal, a non-mandatory subject of bargaining, after JAL refused to bargain on this subject. Plaintiff, relying on cases decided under the NLRA, argues that insistence upon a non-mandatory subject of bargaining, in itself and without more, constitutes a *per se* violation of the bargaining duty imposed by § 2, First. *See, e. g.,* National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); Industrial Union of Marine and Shipbuilding Workers of America v. National Labor Relations Board, 320 F.2d 615, 618 (3d Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964).

█ This Court declines plaintiff's invitation to ingraft rules developed under the NLRA onto the RLA. First, we note that in *Chicago & North Western Railway Co., supra,* the Court cautioned that "parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes. *Cf.* Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969)." 402 U.S. at 579 n. 11, 91 S.Ct. at 1736. The meaning to be attached to this *caveat* appears from the court's awareness of the dangers attendant upon its holding that strike injunctions may issue to enforce § 2, First.

It creates a not insignificant danger that parties will structure their negotiating positions and tactics with an eye on the courts, rather than restricting their attention to the business at hand. Moreover, the party seeking to maintain the status quo may be less

---

6. As the Court understands it, the present contract gives employees who are laid off the right to "bump" into other jobs and stations, replacing JAL employees with less seniority. JAL's subcontracting practices, in effect, limit the opportunity for laid off employees to take advantage of this right.

willing to compromise during the determinate processes of the Railway Labor Act if he believes that there is a chance of indefinitely postponing the other party's resort to self-help after those procedures have been exhausted. See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S., at 380–381, [89 S.Ct. 1109,] cf. Hearings, *supra*, n. 8, at 17, 50, 100 (Mr. Richberg); *id.*, at 190 (Mr. Robertson). Finally, the vagueness of the obligation under § 2, First could provide a cover for freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place.

These weighty considerations indeed counsel restraint in the issuance of strike injunctions based on violations of § 2, First. See n. 11, *supra*.

(footnote omitted) *Id.* at 583, 91 S. Ct. at 1738.

 Second, the means for enforcing the standard of bargaining established by § 2, First, should be developed on a case-by-case basis. See *id.* at 577, 91 S.Ct. 1731. The *per se* rule adopted under the NLRA is inconsistent with such a case-by-case approach. So far as research discloses, this is a case of first impression. It would be premature for this Court to adopt the *per se* rule, urged by the plaintiff, before experience dictated the need for such an approach. *Cf., id.* at 584, 91 S.Ct. 1731.

 In short, this Court holds that the IAM's insistence upon bargaining on "Scope", in and of itself, is not sufficient to establish a § 2, First, violation under the standard enunciated *supra* at pp. 13–15.

 Turning to the application of that standard to the instant case, the Court holds that, viewing the whole of the union's conduct at the bargaining table, the IAM has not violated its § 2, First, duty. The IAM stood willing at all times to bargain about all of the issues which divided the parties. It never took an intransigent position or a "take it or leave it attitude" with respect to any issue. Up to and including the period during which this Court's temporary restraining order was in effect, the parties continued bargaining in an effort to reach agreement. The genuineness of these efforts is evidenced by the fact that there are only fourteen issues remaining upon which the parties have been unable to reach agreement. They include such legitimate subjects of mandatory bargaining as wages, fringe benefits and job security. These issues have been adequately processed through the Act's mandated procedures. The Court cannot conclude, on the present state of the record, that the failure to reach agreement resulted solely from the IAM's insistence upon bargaining on the "Scope" proposal. Nor can it conclude that such insistence reflected a desire on IAM's part not to reach an agreement on the other issues which divide the parties. The parties had bargained about "Scope" in the negotiating sessions which led to the 1972 contract. Even though JAL had sought the advice of legal counsel on the bargainability of "Scope" at that time and had refused to bargain on that issue, ultimately it made a concession on "Scope" which is embodied in Appendix "D" of the 1972 contract. In light of the prior bargaining history of the parties, the IAM would have been justified in believing that ultimately JAL would make some concession on "Scope" and an agreement would be concluded.

Therefore, the Court holds that the plaintiff is not entitled to a preliminary injunction at this time. The Court cannot conclude that a strike would be solely to compel JAL to accede to the union's "Scope" proposal. Moreover, the court in *Chicago and North Western Railway Co., supra,* indicated that strike injunctions should issue only when such a remedy is the only practical and effective means of enforcing § 2, First. 402 U.S. at 582, 583, 91 S.Ct. 1731. If, as plaintiff contends, the "Scope" issue is the only reason for the parties' inability to reach an agreement, this Court's declaration that it is not a mandatory subject of bargaining should be fully effective to protect plaintiff's rights. If subsequent events establish the contrary,

plaintiff may return to this Court for whatever relief proves necessary.

The Court's view that the union has not violated its § 2, First, duty depends upon its assumption that the IAM did not make "Scope" a pre-condition to reaching agreement. This Court has continuing jurisdiction to reappraise the union's "desire to reach agreement" in light of evidence not previously available. *See* Delaware & Hudson Railway Co. v. United Transportation Union, 450 F.2d 603, 623 (D.C.Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

Accordingly, plaintiff's motion for a preliminary injunction is denied and the temporary restraining order is dissolved. However, from the testimony presented, it would appear that the parties are not far apart. Although the Court does not enjoin defendants from resorting to self-help, it hopes that the guidance it has now given the parties will enable them to reach an agreement without the interruption of service.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Settle order on one day's notice in accordance with this opinion.