### INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS Plaintiff,

v.

### TRANS WORLD AIRLINES, INC., Defendant.

### No. 86 Civ. 6913 (KC).

United States District Court, S.D. New York.

May 3, 1988.

Stephen N. Dermer, Lowenstein, Sandler, Kohl, Fisher & Boylan, P.C., Roseland, N.J., for plaintiff.

Richard B. Friedman, Weil, Getshal & Manges, New York City, for defendant.

### OPINION AND ORDER

CONBOY, District Judge:

This action arises out of Carl Icahn's successful efforts to obtain control of Trans World Airlines, Inc. ("TWA"). Plaintiff, the International Association of Machinists ("IAM"), alleges that TWA failed to live up to its end of a bargain that enabled Icahn and his associates to acquire control of the airline. TWA moves to dismiss the complaint for lack of subject matter jurisdiction.

Background

On or about August 5, 1985, the IAM [1] and the Icahn Group ("Icahn") entered into an agreement ("Agreement I") to facilitate Icahn's acquisition of TWA, which was, at the time, the object of a proposed merger with Texas Air.[2] Agreement I provided that if Icahn acquired TWA, the IAM would enter into new collective bargaining agreements for a three-year period providing wage and benefit reductions totalling $50 million per year in exchange for certain covenants from Icahn governing the future operation of the company. TWA was not a party to Agreement I.

On or about December 31, 1985—when it appeared that Icahn had control of TWA—the IAM, Icahn, and TWA entered into two agreements regarding the implementation of Agreement I. In one of those agreements (Agreement II), Icahn represented that during the time it controls TWA, it would cause TWA to fulfill the obligations applicable to TWA in Agreement I. The other agreement (Agreement III) provided for the creation of an employee stock ownership plan and a plan satisfying the provisions of Section 401(k) of the Internal Revenue Code. As contemplated in Agreement I, the parties also entered into new collective bargaining agreements ("the New Collective Bargaining Agreements"), which were annexed to Agreement II as exhibits A and B. The New Collective Bargaining Agreements set forth minimum hourly rates of pay, provisions regulating wage reductions, contributions to the Annuity Plan for Machinists of TWA, procedures for renewing the New Collective Bargaining Agreements, terms for payment of unused vacation time, and the maintenance of basic life insurance.

Plaintiff alleges that TWA violated the three agreements by: disposing of and failing to replace certain assets; failing to obtain aggregate pay and benefit reductions from non-union employees; failing to make minimum capital expenditures; failing to implement a Section 401(k) plan; and making substantial investments in non-airline businesses.

Discussion

Jurisdiction in this action is predicated solely on the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, which governs labor disputes in the airline industry. *Baylis v. Marriott Corporation*, 843 F.2d 658, 662 (2d Cir.1988). The RLA is a detailed legislative scheme which establishes procedures for resolving disputes over "rates of pay, rules, or working conditions." 45 U.S.C. § 153. Disputes arising under the Act fall into two categories which, among other things, determine the limits of judicial intervention in the dispute resolution process. "Minor" disputes, over which labor-management adjustment boards have exclusive jurisdiction, involve "grievances or ... the interpretation or application of existing *collective bargaining agreements.*" *Baylis, supra,* at 662–63 (emphasis added). "Major" disputes, which are subject to an extensive mediation process prescribed by the RLA, "involve the formation of *collective bargaining agreements* or modifications thereof." *Independent Union of Flight Attendants v. Pan American,* 789 F.2d 139, 141 (2d Cir.1986) (emphasis added). If a dispute is major, a federal court may exercise jurisdiction for the limited purpose of maintaining the status quo "while the mediation process runs its course." *Local 553, Transport Workers v. Eastern Air Lines,* 695 F.2d 668, 674 (2d Cir.1983).

IAM alleges that TWA's actions constitute unilateral modifications in the rates of

1. IAM is a labor organization and is the designated and certified representative of approximately 10,000 maintenance and ground service employees of TWA.

2. Each of the parties portrays itself as the other's benefactor in this arrangement. According to the IAM, it "made substantial concessions in the form of reduced wages and benefits ... in order to provide Mr. Icahn with the economic cushion and leverage required by him to finance the acquisition and obtain control of TWA." In TWA's version, "the agreement was executed to *induce* Icahn to seek to acquire control of TWA." It is unnecessary for the purposes of this motion to determine who received a "better deal." Implicit in their agreements is that it was in both of their interests to defeat the merger with Texas Air.

pay, rules and working conditions as embodied in collective bargaining agreements, and asks the Court to maintain the status quo pending mediation. Although none of the allegedly breached contract provisions are contained in the New Collective Bargaining Agreements as defined by the parties, plaintiff urges the Court to ignore the express understanding of the parties and treat the three agreements, in their entirety, as collective bargaining agreements. For the following reasons, the Court concludes that the contract provisions at issue are not contained in collective bargaining agreements, and TWA's alleged actions do not constitute changes, unilateral or otherwise, in rates of pay, rules, and working conditions.

a. The Scope of the Collective Bargaining Agreements.

■ The scope of a collective bargaining agreement is not confined to the express terms of the labor contract, and doubts are to be resolved in favor of coverage. *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). In *Steelworkers*, the seminal case on the construction and interpretation of collective bargaining agreements, a labor union brought suit, pursuant to § 301(a) of the Labor Management Relations Act, to compel arbitration of a grievance arising out of the employer's practice of contracting out work. The issue was not addressed in the collective bargaining agreement, and the agreement provided that "matters which are strictly a function of management shall not be subject to arbitration." Reasoning that "[a]n order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," the Court ruled that the dispute was subject to arbitration. The Court, however, recognized that the parties could have excluded the issue from arbitration had they so desired:

> A specific collective bargaining agreement may exclude contracting out from the grievance procedure. *Or a written collateral agreement may make clear that contracting out was not a matter for arbitration.* In such a case a grievance based solely on contracting out would not be arbitrable. *Id.* at 584, 80 S.Ct. at 1353 (emphasis added).

When there is an ambiguity or gap in a collective bargaining agreement, the principle of broad construction enunciated in *Steelworkers* also permits arbitrators to examine sources outside the four corners of the labor contract to ascertain the intent of the agreement and determine the rights and duties of the parties. In *Rainbow Glass Co. v. Local Union No. 610,* 663 F.2d 814, 817 (8th Cir.1981), the court held that an arbitrator had acted within his authority in resorting to the previous collective bargaining agreement between the parties to resolve an issue left unaddressed by the existing agreement. Although the court rejected the employer's contention that the arbitrator's award was improper because it was not drawn from the existing collective bargaining agreement, the court, echoing *Steelworkers,* recognized the parties' power to exclude particular issues from the labor agreement:

> [T]he situation was not one in which the parties considered the issue during contract negotiations and deliberately omitted it from the [current] contract. In such a case, an arbitrator could not assume that the contract conferred a specific benefit. *Id.*

Thus, despite the well recognized preference for construing collective bargaining agreements broadly, the parties to a collective bargaining agreement are free to exclude particular matters from the labor contract. Here, the parties deliberately and unambiguously excluded the contract provisions in issue from the collective bargaining agreements, presumably to preclude litigation over those provisions in federal court. This presumption is bolstered by Paragraph 14 of Agreement I which provides that the agreement "shall be governed by the laws of the State of New York" and that "[a]ll disputes arising under this Agreement, except disputes arising under the New CBA or disputes as to which this Agreement provides for arbitration, shall be resolved in any court of com-

petent jurisdiction located in the State of New York."

The Court recognizes that this case is unusual in that the parties actually bargained over the management policies at issue in this lawsuit.[3] Nonetheless the Court does not believe that the parties' right to exclude an issue from the purview of the RLA is abrogated by their decision to address the issue in a conventional contract. Accordingly, the Court concludes that the present dispute does not involve a collective bargaining agreement.

b. Rates of Pay, Rules, and Working Conditions.

■ Plaintiff's tenuous assertion of jurisdiction is further weakened by the subject matter of the allegedly breached contract provisions. In *Japan Air L. Co., Ltd. v. International Ass'n of Machinists & Aerospace Workers*, 389 F.Supp. 27 (S.D. N.Y.1975), *aff'd*, 538 F.2d 46 (2d Cir.1976), the court observed that the RLA "speaks in words of limitation. There is only a duty to exert every reasonable effort to make agreements and settle all disputes 'concerning rates of pay, rules, and working conditions.'" *Id.* at 35. The court further observed "that under the RLA, there is an area of managerial decision making or prerogative which is not within the ambit of mandatory bargaining so long as there is no change in the existing working conditions of present employees." *Id.* at 36.

The court concluded that the airlines policy of using outside contractors to perform work similar to that performed by union members was not subject to RLA procedures. In response to the union's contention that the issue was within the scope of the RLA because it affected the job security of union members, the court stated:

> There are numerous decisions which an airline makes which affect the job opportunities of its employees. For example, what rates to establish, what types of airplanes to fly, how many flights to schedule and what fares to change. Yet it cannot seriously be contended that an airline has an absolute duty to negotiate with the union representing its employees concerning these decisions.

Commenting on a similar "conditions of employment" provision in the National Labor Relations Act, Justice Stewart, in *Fibreboard Corp. v. Labor Board*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), stated:

> Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If ... the purpose of [the rule] is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to

**3.** The Court of Appeals confronted a similar set of facts in *Humble Oil & Refining Co. v. Local 866*, 447 F.2d 229 (2d Cir.1971), but the case was decided on grounds that shed no light on the present dispute. There, the union and the employer executed a collective bargaining agreement and a separate "Special Agreement" at the conclusion of a three-month strike. The Special Agreement established procedures for returning employees to work and a special early retirement and layoff program. When a dispute arose over layoff procedures, the union demanded arbitration to determine whether the company violated "the agreement between the parties." Despite the company's objections, the three member arbitration board ruled that "the Special Agreement was enforceable through the grievance and arbitration provisions of [the collective bargaining agreement]."

On appeal, the court ruled that the arbitration board had in fact enforced rights created under the collective bargaining agreement rather than

the Special Agreement. Although the general subject of the arbitration—layoff procedures— was covered by the Special Agreement, the specific source of the dispute—recall rights—was addressed in an "implied provision" of the collective bargaining agreement. Because the arbitration award drew "its essence from the collective bargaining agreement," the court was "spared from passing on whether any violation of the Special Agreement would be arbitrable." Even if the Court of Appeals had decided that the Special Agreement was arbitrable through the arbitration clause of the collective bargaining agreement, *Humble Oil* is distinguishable because, unlike the case at bar, the collateral agreement in that case involved conditions of employment. *Cf. N.L.R.B. v. Amateyus, Ltd.*, 817 F.2d 996 (collective bargaining agreement covered hours, wages, holidays, and layoffs), *cert. denied*, —— U.S. ——, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987).

the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area. *Id.* at 223, 85 S.Ct. at 409 (Stewart, J., concurring).

Except for the agreement to establish a 401(k) plan, which has apparently been adopted[4], the contract provisions in issue fall squarely within the area of managerial decision making discussed in *Fibreboard* and *Japan Air.* It would be anomalous for the Court to rule that matters within "the area of managerial decision making" are beyond the scope of the RLA when the parties are silent, but are within the scope of the Act when the parties have affirmatively agreed otherwise.

The Court is mindful of the fact that the provisions of the New Collective Bargaining Agreements, which reflect an across the board pay-cut for IAM-represented employees, are, at least in part, the consideration for TWA's promises in the three agreements. It does not follow, however, that the whole package of agreements should be read as the collective bargaining agreement. By agreeing to resolve the present disputes under New York law, the union gained some measure of control over matters ordinarily left to the unfettered discretion of management. In this regard, it should be emphasized that TWA does not disclaim its obligations under the agreements. TWA asks only that the IAM now be held to its end of those agreements. The Court can find no fault with that request.

Because plaintiff's claims do not arise under the RLA, defendant's motion to dismiss the amended complaint is granted.

SO ORDERED.

---

4. Acknowledging that TWA has established the 401(k) plan since the filing of the complaint, the IAM now seeks an order "compelling TWA ... to fund the IAM-represented employees' 401(k) plan to a level which would have existed had TWA complied with its collective bargaining agreements."