**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GULF POWER COMPANY, Respondent.**

**No. 24282.**

United States Court of Appeals
Fifth Circuit.

Nov. 6, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Richard Adelman, Atty., N.L. R.B., Washington, D. C., for petitioner.

Bert Lane, Pensacola, Fla., of Beggs, Lane, Daniel, Gaines & Davis, Pensacola, Fla., for respondent.

Before RIVES, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

The National Labor Relations Board has petitioned this court for enforcement of its January 5, 1966 order against Gulf Power Company, wherein it found that the Company had engaged in unfair labor practices in violation of Section 8(a) (5) and (1) of the Act (29 U.S.C. § 151 et seq.) for refusal to bargain with the Union.[1] The issue we must decide is whether safety rules and safe work practices are mandatory subjects of collective bargaining under the provisions of Section 8(d) of the Act relating to the mutual obligation of the employer and the Union "to meet at reasonable times and confer in good faith with respect to wages, hours and *other terms and conditions of employment * * *.*" (Emphasis supplied.)

For more than twenty years the Union has been the exclusive bargaining agent for Gulf Power's employees in an appropriate unit.[2] Gulf Power Company is a public utility engaged in the generation, transmission and sale of electric power,

---

1. Local Unions 1055 and 624 of the International Brotherhood of Electrical Workers (AFL-CIO).

2. The unit is described as follows:
 Overhead line construction and maintenance, including timekeepers and material clerks; underground construction and maintenance; electric service; substation construction and maintenance; communication construction and maintenance; appliance service; meter testing, installation and repair; Pensacola repair shops; Pensacola garage; warehouse section-Pensacola and Panama City stores; meter readers and cut out collectors; steam-electric generating plants-Crist Scholz and Lansing Smith; excluding all office clerical employees, professional employees, watchmen and/or guards and supervisors as defined in the Act, as amended.

with principal offices at Pensacola, Florida, and is engaged in commerce within the meaning of the Act. A collective bargaining contract was entered into between the Company and the Union on December 27, 1962, effective until August 15, 1964, and from year to year thereafter unless either party should give notice of termination or revision. Article VI of said contract entitled "Safety" contained several provisions relative to safe employment practices. The Company also embodied other safety provisions in a 60-page "Safe Work Practices" handbook, prepared by it and issued to all employees, which provided also for discipline or discharge of employees who violated its provisions. The most recent edition of the handbook was published and distributed on January 2, 1963, and was promulgated unilaterally as were other handbooks previously issued. On April 30, 1963, the Company unilaterally revised its safety rules. On June 3, 1963, the Union wrote the Company that it protested the Company's action in having on April 30, 1963 unilaterally placed a revised set of safety rules in operation without having bargained on this subject with the Union. The Company replied that it was required by law to provide reasonably safe and healthful places of employment for its employees, to provide compensation for workmen injured in the course of their employment; that this responsbility rested exclusively with it; and that it could not share its obligations with the Union and could not agree that the Union "take any part in the formulation of policy in respect to safety procedures or other matters for which it bears no responsibility under the law." The Union accordingly filed an unfair labor practice charge against the Company which it withdrew shortly thereafter. On June 15, 1964, the Company and the Union notified each other of intention to revise the contract between them. In the Union's request, "General Asking" No. 8, it sought a meeting to negotiate safety rules during 1964 terms of agreement.

A number of bargaining sessions were held at which the Union stated that it was concerned about safety and wanted some type or program of cooperation with the Company on safety. The Company replied that it would be glad to discuss safety with the Union but was of the view that it could not delegate its responsibility for promulgating and regularly revising safety rules. After six bargaining sessions the Company steadfastly declined to bargain with reference to the promulgation and revision of safe work practice rules, maintaining that this was exclusively the legal and moral nondelegable responsibility of the Company. The present complaint of unfair labor practice was accordingly filed. The Board held a hearing after which it concluded that the Company's action in declining to bargain with the Union with respect to safe work practices and/or safety rules violated Section 8(a) (5) and (1) of the Act. We agree and accordingly order enforcement of the order. It is inescapable that in a public utility electric generating and transmission company the workers, through their chosen representative, should have the right to bargain with the Company in reference to safe work practices. This is not to say that there are not areas where the Company's obligations to the public are paramount and which may not properly be the subject of an agreement with the Union after a bargaining session is held. Nonetheless, the parties by their own actions in the past have clearly indicated that they consider safety rules and practices a bargainable issue by including several important provisions in Article VI of the contract already referred to.

Mr. Justice Stewart in his concurring opinion in Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), stated:

> "What one's hours are to be, what amount of work is expected during those hours, what periods of relief are available, what safety practices are observed, would all seem conditions of one's employment." (379 U.S. at 222, 85 S.Ct. at 409.)

Cf. Westinghouse Electric Corporation v. N. L. R. B., 4 Cir., 1966, 369 F.2d 891; N. L. R. B. v. Washington Aluminum Company, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

 We hold, therefore, in agreement with the Board, that the phrase "other terms and conditions of employment" contained in Section 8(d) of the Act is sufficiently broad to include safety rules and practices which are undoubtedly conditions of employment, and that Section 8(d) requires good faith bargaining as a mutual obligation of the employer and the Union in connection with such matters.[3]

By its failure to bargain with the Union in connection with safety rules and practices, the Company violated the provisions of the Act. The Company's obligation is, therefore, to bargain in good faith as required by Section 8(d) of the Act. The duty to bargain in good faith requires the parties to confer and negotiate in a genuine effort to reach an agreement if it is possible to do so. N. L. R. B. v. Mayes, 5 Cir., 383 F.2d 242 August 22, 1967, No. 23,710. The Act does not compel agreement. National Labor Relations Bd. v. American Nat. Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). The Board held, and we agree with its holding, that the Company refused to bargain with the Union relative to safety rules and practices; that the Company's contention that in all matters pertaining to safety it was immune from bargaining since safety was a prerogative of management was without merit; and thus that the Company had engaged in unfair labor practices within the meaning of the Act.

Enforced.

---

3. Pertinent thereto is the reference by the Board in the margin of its opinion (f. n. 1) which reads as follows:

See Bulletin No. 1201 of the United States Department of Labor, December 1956, entitled "Collective Bargaining Clauses, Labor-Management Safety, Production, and Industry Stabilization Committees," which shows that of a total of 1954 major agreements under study, covering a total of more than 7,-000,000 workers, 281 contracts, covering 1,773,800 workers, provided for joint safety committees of management and union members. In the public utility field, the study shows that of a total of 61 major agreements, covering 176,900 employees, 14 agreements, covering 61,600 employees, contained such provisions.