NORFOLK AND WESTERN RAILWAY COMPANY, a corporation, Plaintiff,

v.

BROTHERHOOD OF LOCOMOTIVE ENGINEERS, an unincorporated association, Robert B. Curtis, S. L. Smith, E. F. Wolfe, J. F. Osborn, and R. L. Smith, Defendants.

Civ. A. No. 77–0211(R).

United States District Court,
W. D. Virginia.

Sept. 15, 1978.

William B. Poff, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., for plaintiff.

Gary E. Tegenkamp, Hunter, Fox & Wooten, Roanoke, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

TURK, Chief Judge.

On October 5, 1977, plaintiff, Norfolk and Western Railway Company, filed this action naming the Brotherhood of Locomotive Engineers and various union officials as defendants, requesting declaratory and injunctive relief prohibiting defendants from progressing by strike, or otherwise, demands made in certain notices filed under § 6 of the Railway Labor Act, 45 U.S.C. § 156. Jurisdiction is pursuant to Title 28 U.S.C. §§ 1331, 2201, and the Railway Labor Act, 45 U.S.C. § 151 *et seq.*[1] The notices in question were served upon the plaintiff on October 1, 1974, and relate to the design and operation of plaintiff's locomotives. In particular, it was proposed:

1. That the short end of all diesel units be designated as the front end and the operating controls be located on the right side of the engine cab for operation in the forward direction. This will apply to single control units only.

2. That engineers not be required to operate in forward direction from the left side of the engine cab.

3. That the operating controls and all appurtenances related thereto be located in the engine cab so as to be easily accessible to the engineer looking in the direction he is moving.

Plaintiff maintains that the subject matter of the § 6 notices is not subject to collective bargaining under the Railway Labor Act. Defendants contend, however, that the subject matter of the § 6 notices is a mandatory subject of collective bargaining, and have moved to dismiss the complaint or in the alternative for summary judgment.

There are two categories of disputes under the Railway Labor Act: major and minor. A "major dispute" is one arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions. As such, a major dispute pertains "to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, J. & E. R. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). A "minor dispute," on the other hand, is one involving "a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms to create a new one. The [minor] dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.* In a minor dispute, therefore, the claim relates to rights accrued, not to the acquisition of new ones. *Id.* Undoubtedly, the present controversy is a "major dispute" under the Act as it pertains "to the acquisition of rights for the future, and not to assertion of rights claimed to have vested in the past." *Id.*

Irrespective of whether a controversy is a major or minor one, of central importance is the duty imposed upon the parties by § 2 First, Title 45 U.S.C. § 152, First, of the Railway Labor Act. As stated by the Supreme Court, "[t]he heart of the Railway Labor Act is the duty, imposed by § 2 First, upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'"[2] *Brotherhood of Railroad*

---

1. Jurisdiction is also proper under Title 28 U.S.C. §§ 1331 and 1337 in conjunction with various federal substantive provisions.

2. § 2 First, Title 45 U.S.C. § 152, First, Railway Labor Act, provides, in relevant part, the obligations of carriers and unions:

It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to

Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377–378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969); Chicago & N. W. R. Co. v. United Transportation Union, 402 U.S. 570, 574, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); Piedmont Aviation, Inc. v. Airlines Pilots Association International, 416 F.2d 633, 635 (4th Cir. 1969). This duty is "more than a mere statement of policy or exhortation to the parties; rather," it is "a legal obligation enforceable by whatever appropriate means might be developed on a case-by-case basis." Chicago & N. W. R. Co. v. United Transportation Union, supra, 402 U.S. at 577, 91 S.Ct. at 1735.

■■■ Procedurally, major dispute resolution under the Act is a succession of well-planned steps designed to bring the parties to terms. The particular major dispute procedures were summarized by the Supreme Court in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra, 394 U.S. at 378, 89 S.Ct. at 1115:

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its

ways through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

As noted by the Supreme Court in Railway Clerks v. Florida E. C. R. Co., 384 U.S. 238, 246, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966), the procedures under the Act "are purposely long and drawn out based on the hope that reason and practical consideration will provide in time an agreement that resolves the dispute," and, as previously stated, they must be exhausted before either party may unilaterally alter the *status quo.* Detroit & Toledo Shoreline Railroad Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). Once they have been exhausted, however, the disputants are free to resort to self-help. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra, 394 U.S. at 378–379, 89 S.Ct. 1109; Railway Clerks v. Florida E. C. R. Co., supra, 384 U.S. at 244, 86 S.Ct. 1420; Locomotive Engineers v. Baltimore & O. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960).

In the present case, during the conference stage of the major dispute procedures plaintiff asserted that it had concluded that the matters proposed by defendants were not mandatory subjects of collective bargaining under the Railway Labor Act and that any attempt by defendants to bargain over them would be unlawful. Plaintiff gave three reasons in support of its position:

1. Norfolk and Western has been charged with a nondelegable responsibility for the design and construction of its locomotive units under the Boiler Inspection Act [Acts] ([45] *U.S.C.* §§ 22–34) and Federal Railroad Administration Regulations (49 *C.F.R.* § 230.200a). Neither Norfolk and Western's responsibility in this respect nor the FRA's authority can be controlled or limited by collective bargaining agreement.

avoid any interruption to commerce or to the operation of any carrier growing out of any

dispute between the carrier and the employees thereof.

2. Adoption of BLE's proposals would result in substantial operating inefficiencies in contravention of the Interstate Commerce Act's National Transportation Policy ". . . to promote . . . economical, and efficient service and foster sound economic conditions in transportation . . . ."

3. The subjects covered in BLE's notices are matters which are within the sole prerogative of management and do not affect "rates of pay, rules or working conditions" of employees. This is illustrated by the following discussion from *Japan Airlines Co. v. International Association of Machinists & Aerospace Workers*, 389 F.Supp. 27 (S.D.N.Y.1975):

"[T]he IAM's 'Scope' proposal goes directly to JAL's right to control the direction of its business enterprise. It goes to the method by which JAL has chosen to operate its business . . . . There are numerous decisions which airlines make which affect the job opportunities of its employees. For example, what rates to establish, what types of airplanes to fly, how many flights to schedule, and what fares to charge. Yet, it cannot seriously be contended that an airline has an absolute duty to negotiate with the union representing its employees concerning these decisions."

Nevertheless, the National Mediation Board docketed the case and attempted to render its mediatory services. Upon concluding, however, that its services would be unavailing, the Board requested the parties to submit the controversy to arbitration. This offer was rejected, and the Board notified the parties that its services had been terminated and that, in accordance with the provisions of the Act, the parties were free to exercise economic self-help at the conclusion of the thirty day cooling-off period. Consequently, the procedures of the Act have been exhausted.

The question this court must consider first is whether the subject matter of the § 6 notices pertains to "working conditions" within the contemplation of § 2 First of the Act. The answer to that question, in turn, rests upon an understanding of the import of the proposed changes. The evidence indicates that the proposed modifications of the diesel units in question are designed to make more accessible and visible to the engineer cab controls and gauges and to give the engineer a greater view of the roadbed and signaling systems. The defendants believe that with the desired changes operation of the units will be safer for the engineer, and his working quarters will be more comfortable.

Under the Act, the term "working conditions" refers to actual, objective working conditions, "broadly conceived." *See Detroit & Toledo Shoreline Railroad Co. v. United Transportation Union, supra*, 396 U.S. at 153, 90 S.Ct. 294; *United Transportation Union Local 31 v. St. Paul Union Depot Co.*, 434 F.2d 220, 223 (8th Cir. 1970). As defendants' proposed changes relate to the comfort and safety of the members of the union in the operation of plaintiff's locomotives, those proposals fall within the literal terms of the Act. In the third reason stated above, however, advanced by plaintiff to support its position that the matters proposed by defendants are not mandatory subjects of collective bargaining, it is contended that the subject of the § 6 notices pertains to matters which are within the sole prerogative of management and which do not affect "rates of pay, rules, or working conditions" of employees. Plaintiff asserts that recognition of this managerial responsibility, insofar as it relates to locomotive design, is found in the Boiler Inspection Acts, 45 U.S.C. §§ 22–34, which imposes upon the carrier the duty of seeing that its locomotives and appurtenances are "in proper condition and safe to operate . . . ." [3]

---

**3.** Specifically, plaintiff points to Title 45 U.S.C. § 23 which provides the carrier's duty:

It shall be unlawful for any carrier to use or permit to be used on its line any locomotive

This court finds plaintiff's claim of managerial prerogative to be without merit. While, no doubt, "under the Railway Labor Act, there is an area of managerial decision making or prerogative which is not within the ambit of mandatory bargaining . .," *Japan Airlines Co. v. International Association of Machinists and Aerospace Workers,* 389 F.Supp. 27, 36 (S.D.N.Y.1975), to find such a prerogative for the sole reason that a general responsibility for safety has been allocated to plaintiff by statute would be tantamount to a determination that safety measures are not subject to collective bargaining agreements. Unquestionably, most any industry or business enterprise has a duty to provide for the safety of its employees and the public, whether that duty is pursuant to common law or legislative pronouncement. Given the logic of plaintiff's arguments, however, management in those industries would have no duty to bargain with labor concerning safety practices affecting union members. Such a position is untenable. The propriety of negotiating over matters involving the safety of workers was well established at common law[4] and is no less established pursuant to the National Labor Relations Act. In *National Labor Relations Board v. Gulf Power Co.,* 384 F.2d 822 (5th Cir. 1967), a similar argument to that of plaintiff's was advanced and rejected, the court finding without merit management's "contention that in all matters pertaining to safety it was immune from bargaining since safety was a prerogative of management . . .." *Id.* at 825. Although that case was decided under the Labor Relations Act, no valid reason has been advanced by plaintiff as to why it should not apply with equal force to the present controversy under the Railway Labor Act. Accordingly, it is concluded that the subject matter of the § 6 notices in question pertains to working conditions as defined by § 2 First of the Railway Labor Act, 45 U.S.C. § 152, First.

Plaintiff has abandoned its above-stated contention that the defendants' "proposals would result in substantial operating inefficiencies in contravention of the Interstate Commerce Act's National Transportation Policy ' . . . to promote economical, and efficient service and foster sound economic conditions in transportation . . .' " Consequently, the question remaining pertains to the first reason advanced by plaintiff in support of its objection to defendants' § 6 notices. In objecting to the notices, plaintiff maintained that it was "charged with a nondelegable responsibility for the design and construction of its locomotive units under the Boiler Inspection Acts (U.S.C. §§ 22–34) and Federal Railroad Administration regulations (49 C.F.R. § 230.200a)," and that neither the Federal Railroad Administration's authority nor its own in that respect could be "controlled or limited by collective bargaining agreement." The thrust of plaintiff's arguments

unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28 to 30 and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for.

Regulations of the Federal Railroad Administration also allocate such a duty to management:

The railroad company is held responsible for the general design construction, inspection, and repair of all locomotives used or permitted to be used on its line. It must know that all inspections, tests, and repairs are made and reports made and filed as required, and that all parts and appurtenances of every locomotive used are maintained in condition to meet the requirements of the law and the rules and instructions in this subpart. Nothing contained in the rules and instructions in this subpart, however, shall be construed as prohibiting any carrier from enforcing additional rules and instructions not inconsistent with those in this subpart contained, tending to a greater degree of precaution against accidents.

Title 49 CFR § 230.200a.

4. The subject of the § 6 notices in question involves labor saving devices as well as safety measures. These matters were the proper object of concerted action at common law. Restatement of Torts § 784, Comment c.

in furtherance of its position, however, is much broader. It is maintained that Congress intended for the Boiler Inspection Act to occupy the field of locomotive design and safety to the exclusion of all collective bargaining agreements pertaining to those matters. Accordingly, plaintiff would have this court find that the only proper method for advancing defendants' proposed modifications is by presenting them to the Federal Railroad Administration. On the other hand, defendants contend that the Act evinces no congressional intention to preclude collective bargaining agreements which promote a greater degree of safety so long as those agreements are not inconsistent with the provisions of the Act or the regulations promulgated under the Act. Moreover, they contend that the Federal Railroad Safety and Hazardous Materials Transportation Control Act of 1970, Title 45 U.S.C. § 421 *et seq.*, authorizes collective bargaining over the subject matter of their notices.

In 1911 Congress passed the first in the series of the acts which have come to be known as the Boiler Inspection Acts, Title 45 U.S.C. §§ 22–34. The 1911 Act, Boiler Inspection Act, ch. 103, §§ 1–9, 36 Stat. 913 (1911), had as its purported purpose the promotion of "the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances . . . ." H.R.Doc.No.1974, 61st Cong., 3rd Sess. 1 (1911). Central to the Act was the prohibition against using in interstate commerce "any locomotive engine propelled by steam power" unless its boiler and appurtenances were "in proper condition and safe to operate . . . without unnecessary peril to life or limb . . . ." Boiler Inspection Act, ch. 103, § 2, 36 Stat. 913 (1911). The Interstate Commerce Commission was given authority to make all needful rules, regulations, and instructions to insure that locomotive engines were properly equipped and safe to operate. By way of enforcement, carriers were required to inspect their own locomotives in accordance with rules and instructions which they pre-

pared but which were subject to approval and modification by the Interstate Commerce Commission. The Act also established inspectors who were to receive from the carriers reports of the carriers' regular and periodic inspections detailing the findings of each inspection including a disclosure of any repairs or defects revealed by the inspection. Any inspector finding a boiler or appurtenance to be in improper condition was authorized to order it out of service subject to appeal, with the ultimate right of review by the Interstate Commerce Commission. The Act also provided for the filing of reports concerning accidents involving serious injury or death and which were to be investigated by the inspectors with their findings to be made public.

In 1915 the Act was amended so as to extend its provisions to " . . . include the entire locomotive and tender and all parts and appurtenances thereof, instead of applying to the boiler alone . . . ." Boiler Inspection Act, ch. 169, 38 Stat. 1192 (1915); H.R.Doc.No.995, 63rd Cong., 2nd Sess. (1914). In 1924 it was again amended in several respects. Boiler Inspection Act, ch. 355, 43 Stat. 659, §§ 1–4, 6 (1924). Included among the changes were amendments making interstate carriers "liable not only for using unsafe or uninspected locomotives in moving interstate traffic . . . but also for using such locomotives in intrastate traffic . . . " and amendments bringing all locomotives within its coverage. *See* H.R.Doc.No.490, 68th Cong., 1st Sess. (1924). Other amendments to the Act occurred in 1918, ch. 105, 40 Stat. 616, § 1, and in 1940, ch. 124, §§ 1–3, 54 Stat. 148. For the most part, however, those amendments pertained to the allocation of duties among inspectors and matters relating to personnel management.

The relevant substantive provisions of the Boiler Inspection Act remain substantially unchanged since 1924. The administrative functions of the Interstate Commerce Commission have been transferred to the Secretary of Transportation, Title 49 U.S.C. § 1655(e)(1)(E), and these functions, in turn, have been subdelegated to the Federal Rail-

road Administrator, Title 49 U.S.C. § 1655(f)(3)(A). Pursuant to his statutory authorization, the Federal Railroad Administrator has promulgated regulations relating to locomotive safety. The regulations relating to nonsteam propelled locomotives are relatively detailed in their requirements, *see* Title 49 C.F.R. §§ 230.200–458, although they in no measure exhaust the subject of locomotive maintenance or design. Consistent with this scheme of regulation "[t]he railroad company is held responsible for the general design, construction, inspection, and repair of all locomotives used or permitted to be used on its line," Title 49 C.F.R. § 230.200a, and is permitted to enforce " . . . additional rules and instructions . . . tending to a greater degree of precaution against accidents," so long as those additional rules and instructions are not inconsistent with those promulgated by the Secretary. *Id.*

■■■■ There is no doubt but that the Boiler Inspection Act was intended by Congress to occupy the field of regulating locomotive equipment to the exclusion of state regulation in that regard. *Napier v. Atlantic Coastline Railroad Co.,* 272 U.S. 605, 47 S.Ct. 207 (1926). Furthermore, the Federal Railroad Administrator has the authority to require locomotive modifications in the interest of safety on complaint of the union representing employees duly affected. *See generally, U. S. v. Baltimore & Ohio Railroad,* 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587 (1935). It does not follow, however, that collective bargaining agreements pertaining to those matters are precluded. Preemption is a judicially created doctrine based on the Supremacy Clause of the Constitution. It is a natural derivative of our federal system conceived to reconcile the exercise of authority by the federal and state governments within a single framework. *See generally,* Tribe, American Constitutional Law, §§ 6–23 through 6–27 (1978). The issue to be resolved, however, pertains to the reconciliation of policies underlying two congressional pronouncements, the Boiler Inspection Act and the Railway La-

bor Act. Cases involving preemption in the context of federal-state relations are, therefore, inapposite.

■■■■ The underlying policy of the Boiler Inspection Act is the promotion of safety of employees and travelers upon the railroad. The underlying policies of the Railway Labor Act are directed to the peaceful settlement of disputes through mutual agreement. Implementation of the Boiler Inspection Act is accomplished primarily by placing responsibility upon the carrier to see that its locomotives are safe. Accordingly, as previously stated, the carrier is responsible for general design, construction, inspection, and repair of its locomotives. Thus, it has considerable leeway in the decision-making process. Augmenting the carrier's duties is the authority of the Federal Railroad Administration to set general or particular standards. On the other hand, implementation of the policies of the Railway Labor Act is accomplished by placing the duty upon the parties to bargain collectively over rates of pay, rules, and working conditions within the framework of that Act. It is management's considerable discretion pertaining to safety which labor seeks to influence in the context of collective bargaining. Plaintiff maintains that the public interest is not fully represented in that bargaining process and that to avoid the danger that extraneous considerations might influence the adoption of rules regarding locomotive design, or that disputes might delay the formulation of better rules, the court should conclude that it was the Congress' intention to have an independent agency hear and determine all such matters. Moreover, it is asserted that only through the Federal Railroad Administration can an impartial, expert, and uniform solution to locomotive design safety be achieved.

■■■■ The court has concluded that the underlying policy of the Boiler Inspection Act of insuring safety in the design, construction and maintenance of locomotives would not be materially advanced and

that the policies of the Railway Labor Act which encourage labor and management to make and maintain agreements concerning rates of pay, rules, and working conditions would be frustrated by a determination that the Boiler Inspection Act so occupies the field of locomotive safety as to preclude collective bargaining over matters within its purview. It is erroneous to assume that the public interest would be more fully served by precluding collective bargaining over matters of safety. The danger of extraneous considerations entering into the field of locomotive design is no less present when management is exercising its discretion in the general design, construction, and maintenance of locomotives than when labor seeks to share in the exercise of that discretion. Locomotive design is as much a product of historical development and the economics of necessity as it is a creature of safety engineering. Furthermore, the carrier has no duty to bargain, and indeed may not bargain, over proposals which conflict with particular or general standards dictated by the Act and its implementing regulations. Moreover, if extraneous matters are interjected into the bargaining process under the auspices of safety there is undoubtedly a violation of the duty to bargain in good faith. *See generally, Elgin, J. & E. R. Co. v. Burley, supra*, n. 12, 325 U.S. at 721–722, 65 S.Ct. 1282; *Solo Cup Co. v. NLRB*, 332 F.2d 447 (4th Cir. 1963). On the other hand, if the employees concerned are denied the right to bargain collectively, they are deprived of an important tool to implement changes affecting their own welfare and safety. This court will not attempt to remove from collective bargaining under the Railway Labor Act a matter falling within its literal terms on general notions of the exclusiveness of the Boiler Inspection Act not otherwise expressed in

that Act or readily inferable from its legislative history or the policies which it serves. The court, accordingly, finds that the subject matter of the § 6 notices in question is a mandatory subject of collective bargaining.[5]

In reaching its decision, the court must note that it is not persuaded that the Federal Railroad Safety and Hazardous Materials Transportation Control Act of 1970, 45 U.S.C. § 421 *et seq.*, which was enacted to promote safety in all areas of railroad operations, lends support to defendants' position. Although in its legislative history it is stated that § 202(a), Title 45 U.S.C. § 431(a) "provides that the Secretary's authority[6] over all areas of railroad safety is not to be construed to prevent management and labor from bargaining collectively under the Railway Labor Act . . . provided that such agreements are not inconsistent with Federal Safety requirements," H.R.Doc.No. 91–1194, 91st Cong., 2nd Sess. 2, *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4104, 4114, the Act itself provides that nothing in subchapter II, ch. 13 of Title 45, is to be construed as prohibiting collective bargaining agreements under the Railway Labor Act so long as they "are not inconsistent with rules, regulations, orders, or standards prescribed by the Secretary . . . ." Consequently, as the Boiler Inspection Act is in a different chapter of Title 45, the clause permitting collective bargaining agreements is inapplicable. Furthermore, this position is bolstered by the legislative history of the Safety Act which makes it clear that existing statutes are "to be administered and enforced as if [that] legislation had not been enacted." H.R.Doc.No.91–1194, 91st Cong., 2nd Sess. 2, *reprinted in* [1970] U.S.Code Cong. &

**5.** Although it has been suggested that the mandatory-permissive distinctions of the National Labor Relations Act are inappropriate under the Railway Labor Act, the court is persuaded to the contrary by *Japan Airlines Co. v. International Association of Machinists & Aerospace Workers*, 538 F.2d 46 (2nd Cir. 1976).

**6.** Pursuant to Title 45 U.S.C. § 431 administrative functions under the Federal Railroad Safe-

ty and Hazardous Materials Transportation Control Act of 1970 are in the Department of Transportation. Title 49 U.S.C. § 1657(e)(1) allows the delegation of those powers by the Secretary. With certain limited exceptions, the Secretary's authority under the Act was delegated to the Federal Railroad Administrator by Title 49 C.F.R. § 1.49(n).

Admin.News, pp. 4104, 4114. The court's opinion, therefore, declaring defendants' § 6 notices to involve mandatory subjects of collective bargaining is predicated entirely upon an examination of the Boiler Inspection and Railway Labor Acts.

For the above-stated reasons, an appropriate order of judgment will be entered[7] granting declaratory relief for defendants.

**7.** Defendants moved to dismiss plaintiff's complaint on jurisdictional grounds. The court finds that motion to be without merit. *Chicago* *& N. W. R. Co. v. United Transportation Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).